UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

HAJI NAJIBULLAH,

Defendant.

S2 14 Cr. 401 (KPF)

**THE GOVERNMENT'S SENTENCING SUBMISSION**

JAY CLAYTON
United States Attorney for the
Southern District of New York
26 Federal Plaza, 37th Floor
New York, New York 10278

Sam Adelsberg
Jacob H. Gutwillig
David J. Robles
Assistant United States Attorneys
    *Of Counsel*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ..................................................................................................... 1

OFFENSE CONDUCT ................................................................................................................... 2

   I.  The Taliban  ................................................................................................................2

      A.    Background on the Taliban ................................................................................. 2

      B.    The Taliban and the Haqqani Network .............................................................. 6

   II.  The Defendant's Role as a Taliban Commander ................................................................7

      A.    The French Interviews ........................................................................................ 7

      B.    The June 2008 Convoy Attack ......................................................................... 14

      C.    Additional Acts of Terrorism ........................................................................... 17

   III. The Hostage Taking  ...........................................................................................20

      A.    The Defendant Engineers the Hostage Taking ................................................ 20

      B.    The Captivity ..................................................................................................... 23

      C.    Ransom Calls and Proof of Life Videos .......................................................... 26

      D.    The Escape ........................................................................................................ 31

PROCEDURAL HISTORY ......................................................................................................... 33

      A.    Charges and the Defendant's Arrest ................................................................ 33

      B.    The Defendant's Rule 12 Motions and Attempt to Obstruct Justice .......................... 34

      C.    The Defendant's Guilty Plea ............................................................................ 36

THE PSR ...................................................................................................................................... 38

   I.   The Probation Department's Guidelines Calculation and Recommendation ..............38

   II.  The Defendant's Objections to the PSR are Meritless  ...................................40

ARGUMENT ................................................................................................................................ 46

   I.   The Governing Legal Framework...................................................................................46

   II.  The Court Should Impose a Guidelines Sentence of Life Imprisonment ...................47

      A.    The Nature and Circumstances of the Offense and the Need for Just Punishment
Warrant a Sentence of Life Imprisonment ........................................................................... 48

      B.    The History and Characteristics of the Defendant ........................................... 55

      C.    The Need to Afford Adequate Deterrence and Promote Respect for the Law ........... 57

      D.    A Life Sentence Would Not Result in Unwarranted Sentencing Disparities ............. 60

   III. The Defendant's Sentencing Arguments Are Meritless  ...................................64

      A.    The Defendant's Guilty Plea ............................................................................ 64

i

B.    The Defendant's Personal Background ........................................................ 66

C.    The Defendant's Role as a Taliban Commander and the June 2008 Attack .............. 67

D.    The Defendant's Prosecution as a Member of the Taliban........................................ 70

E.    The Defendant's Conditions of Confinement ............................................................ 72

CONCLUSION.................................................................................................................... 73

**PRELIMINARY STATEMENT**

The Government respectfully submits this memorandum in response to the defendant's May 27, 2026 sentencing submission ("Def. Mem."), and in connection with the June 9, 2026 sentencing in this matter.

The defendant was a Taliban commander who waged a campaign of violence aimed at killing U.S. servicemembers and their allies in Afghanistan. To achieve that objective, Taliban fighters under the defendant's command were prepared to and did carry out acts of terrorism using suicide bombers, explosive devices, and automatic and anti-tank weapons. Among those terrorist attacks was the June 2008 ambush of a U.S. convoy in which three U.S. servicemembers and their Afghan interpreter were brutally murdered. The defendant later claimed responsibility, stating that his men had carried out this attack and that it had resulted in the deaths of U.S. servicemembers

This conduct, standing alone, would merit a serious sentence, but the defendant's criminal conduct was not limited to his role in the killing of military personnel. He also led and directly participated in the hostage taking of civilians. More specifically, in November 2008, the defendant engineered the hostage taking of an American journalist, his Afghan interpreter, and their Afghan driver. For over seven months, the defendant and his co-conspirators held the hostages in various safehouses in Afghanistan and Pakistan, aiming to extort ransom payments and the release of Taliban prisoners from the U.S. Government. The defendant and his co-conspirators forced the hostages to film proof of life videos during which Taliban fighters pointed automatic weapons at the hostages as they pleaded for their families and the U.S. Government to meet the Taliban's demands. Every day of their captivity, the hostages and their families lived in fear that they would never see their loved ones again.

1

The conduct underlying the defendant's conviction was harrowing.  It resulted in the deaths of at least four victims and the hostage taking of three others.  It caused unimaginable pain and suffering to the families and loved ones of each of those victims.  Justice demands the most serious of consequences permitted under the law.  Nothing in the defendant's sentencing submission alters that conclusion—indeed, the defendant fails to grapple with the severity of his conduct, and instead, focuses his sentencing advocacy on anything but the core conduct to which he pled guilty, and which brings him before the Court for sentencing.  Accordingly, and for the reasons set forth herein, the Government respectfully submits that a Guidelines sentence of life imprisonment would be sufficient, but not greater than necessary, to achieve the goals of sentencing.

## OFFENSE CONDUCT

**I.    The Taliban**

### A.    Background on the Taliban

The Taliban is a militant Islamist organization that exercised de facto control of Afghanistan between approximately 1996 and 2001, and once again starting in 2021.  During the periods in which the Taliban has exerted such control over Afghanistan, it has imposed *sharia* law (strict Islamic religious law); fostered terrorists, including Usama bin Laden and members of al Qaeda, and members of the "Haqqani Network," a designated Foreign Terrorist Organization that worked closely with the Taliban; produced and exported massive amounts of heroin; and attacked and murdered U.S. troops and civilians.  (*See, e.g.*, Aug. 8, 2024 Hr'g Tr. at 104-105; June 2, 2026 Revised Presentence Investigation Report ("PSR"), ¶ 10).  At no point has the U.S. Government, or the international community more broadly, recognized the Taliban as a legitimate government.  (*See* Aug. 8, 2024 Hr'g Tr. at 103-104).  Indeed, since approximately 2002, the Taliban has been

2

designated by the U.S. Department of State as a Specially Designated Global Terrorist entity under Executive Order 13224.  (*See id*. at 110-111).

The Taliban was started in the early 1990s with its founding nucleus—the word "Taliban" is Pashto for "students"—of men studying Islam in Afghan and Pakistani madrassas, or religious schools.  (PSR ¶ 10).  The Taliban soon found a foothold and consolidated their strength in southern Afghanistan.  (*Id.*).  By 1994, the Taliban had moved their way through the south, capturing several provinces from various armed factions who had been fighting a civil war after the Soviet-backed Afghan government fell in 1992.  (*Id.*).  By September 1996, the Taliban had captured Kabul, murdered Afghanistan's president, and established the Islamic Emirate of Afghanistan.  (*Id.*).  The Taliban's first policy was to institute a strict interpretation of *sharia* law and jurisprudence.  (*Id.*).  The Taliban then began enforcing merciless policies regarding the treatment of women, political opponents of any type, and religious minorities.  (*Id.*).

In the years leading up to the September 11, 2001 attacks in the United States, the Taliban provided a safe haven for al Qaeda, giving the terrorist group a base in which it could freely recruit, train, and deploy terrorists to other countries.  (PSR ¶ 11).  Immediately following the September 11 attacks, Taliban harbored the perpetrators of those attacks.  (*See* Aug. 8, 2024 Hr'g Tr. at 105).  In approximately October 2001, the Taliban were ousted from power following the invasion of Afghanistan by a U.S.- and NATO-led coalition of international forces ("Coalition Forces"). (*Id*).  The international community then worked to establish a transitional government that would eventually lead to a more formal government.  Democratic elections were held in Afghanistan in 2004.  (*Id.*).

After being ousted from power in 2001, many of the Taliban's leaders, including its supreme leader Mullah Omar, fled to the federally administered tribal areas of neighboring Pakistan. (*See* Aug. 8, 2024 Hr'g Tr. at 106).  The Taliban then conducted a years-long armed insurrection against the democratically elected Afghan government and perpetrated numerous terrorist attacks against Coalition Forces and their Afghan partners.  (PSR ⁋ 12).  To target Coalition Forces, the Taliban regularly employed guerilla tactics, including suicide bombings, improvised explosive devices ("IEDs"), attacks on U.S. aircraft, and ambushes with rocket propelled grenades ("RPGs") and small arms.  (*Id.*).  Indeed, the Taliban was responsible for most of the insurgent attacks on Coalition Forces that occurred in Afghanistan, which followed an established pattern of regular low-level ambush and hit-and-run attacks, coupled with periodic high-profile attacks.  (*Id.*).  And when the Taliban captured Afghan soldiers or Afghan police officers, the individuals were "routinely" executed, "either just shot or beheaded."  (Aug. 8, 2024 Hr'g Tr. at 124).  These attacks resulted in the deaths of thousands of members of the Coalition Forces and their Afghan partners.  (PSR ¶ 12).

By approximately 2008, the Taliban's leadership had "coalesced in Pakistan" under Mullah Omar.  (*See* Aug. 8, 2024 Hr'g Tr. at 112).  However, Taliban members operating in many areas of Afghanistan at this time did not have a clearly defined command structure and instead operated under local commanders, like the defendant, including when instructed to carry out attacks.  (*See id.* at 114-115).  Around this same time, the Taliban also issued a series of "codes of conduct," some of which specifically instructed Taliban members to, among other things, wear civilian clothing to blend into the population, carry out suicide attacks, and burn down schools built by NGOs.  (*See* PSR ¶ 13; Aug. 8, 2024 Hr'g Tr. at 121, 127, 130).  For example, one of the rules in

the Taliban's code of conduct permitted the killing of civilians who transported food or fuel for either Coalition Forces or the Afghan government. (*See* Aug. 8, 2024 Hr'g Tr. at 126). Another rule expressly called for the use of suicide attacks against what the Taliban viewed as high priority targets. (*See id*. at 127).[1]

The Taliban implemented these codes of conduct to carry out brutal attacks against civilian populations, including against individuals working for NGOs providing services and aid in Afghanistan. (*See* PSR ¶ 13; Aug. 8, 2024 Hr'g Tr. at 119). Some of the attacks included "mortar attacks against [] construction workers" carrying out infrastructure projects and the kidnapping and murder of other individuals associated with NGOs. (Aug. 8, 2024 Hr'g Tr. at 122). And to maximize civilian casualties, the Taliban also regularly carried out suicide bombings in densely populated areas. For example, in January 2008, the Taliban claimed responsibility for an attack inside a luxury hotel in Kabul, during which suicide bombers and shooters targeted civilians, resulting in multiple deaths. (*Id*. at 119). As another example, in July 2008, the Taliban carried out a suicide attack at the Indian embassy in Kabul, killing two Indian government officials and dozens of civilians. (*Id*.).

In addition to suicide bombings, the Taliban also condoned and carried out the kidnapping of foreign civilians, viewing such kidnappings as "as an opportunity to collect ransom" and to "negotiate the release of Taliban prisoners that were being held by the Afghan government in exchange for these foreign hostages that they were holding." (Aug. 8, 2024 Hr'g Tr. at 132). And

---

[1] At times, the Taliban chose teenagers or "individuals of limited mental capacity" to carry out these suicide attacks, "who had been essentially compelled either to wear the vest or had it strapped to them." (*Id*. at 127-128).

to deter the local population from participating in democratic elections, the Taliban regularly dismembered civilians whom the Taliban learned had participated in those elections, cutting off fingers, ears, and noses.  (*See id*. at 129-130).

###### B.        The Taliban and the Haqqani Network

The Haqqani Network is a Sunni Islamist militant organization founded by Jalaluddin Haqqani ("Jalaluddin"), who emerged as a top Afghan warlord and insurgent commander during the anti-Soviet war described above.  (PSR ¶ 14).  Jalaluddin later allied with the Taliban, becoming the group's Minister of Tribal and Border Affairs when the Taliban held power in Afghanistan during the mid-to-late 1990s.  (*Id*.).  He was a known associate of Usama bin Laden and was recognized as one of bin Laden's closest mentors during the al Qaeda founder's formative years.  (*Id*.).  Jalaluddin's sons led the day-to-day activities of the group, alongside several of his closest relatives, and took on senior roles in the Taliban—cementing the alliance between the Haqqanis and the Taliban.  (*Id*.)  As described further below, two of Jalaluddin's sons—Badruddin and Sirajuddin Haqqani—played prominent roles alongside the defendant in the hostage taking of three civilians (referred to herein as "Hostage-1," "Hostage-2," and "Hostage-3") to which the defendant pled guilty in this case.

The Haqqani Network was primarily based in North Waziristan, Pakistan, and conducted cross-border operations into eastern Afghanistan and Kabul.  (PSR ¶ 15).  The Haqqanis were considered the most lethal and sophisticated insurgent group targeting Coalition Forces in Afghanistan; they typically conducted coordinated small-arms assaults coupled with rocket attacks, IEDs, suicide attacks, and attacks using bomb-laden vehicles, and were responsible for some of the highest-profile attacks against Coalition Forces.  (*Id*.)  The group was also involved

6

in an array of criminal activities in Afghanistan and Pakistan, including extortion, kidnapping, and smuggling.  (*Id*.).

In September 2012, the Haqqani Network was designated by the State Department as a Foreign Terrorist Organization because of its involvement in the Afghan insurgency, attacks on U.S. military and civilian personnel and Western interests in Afghanistan, and because of its ties to the Taliban and al Qaeda.[2]

## II.    The Defendant's Role as a Taliban Commander

Beginning in or about 2007, the defendant served as a Taliban commander in Afghanistan's Wardak Province, which borders Kabul.  (PSR ¶ 16).  In this role, the defendant commanded numerous Taliban fighters and reported to senior leadership in the Taliban and the Haqqani Network.  (*Id*.).  At times, the defendant also acted as an unofficial spokesperson for the Taliban, publicly promoting the Taliban's aims and tactics.  (*Id*.).  As described below, during this period, the defendant and the Taliban fighters under his command conducted attacks on Coalition Forces and their Afghan allies, using automatic weapons, IEDs, RPGs, and other anti-tank weapons.  (*Id*.).  As discussed below, the attacks that the Taliban fighters under the defendant's command carried out were often ambush-style attacks, particularly when targeting unsuspecting U.S. military convoys.  These attacks resulted in the deaths of U.S. servicemembers.  (*See* Plea Agmt. Ex. A).

### A.  The French Interviews

In November 2007 and September 2008, the defendant participated in two videorecorded interviews with a French reporter, which were later aired on the French news media network,

---

[2] *See* https://www.state.gov/foreign-terrorist-organizations.

France24 (the "French Interviews"). (*See* PSR ¶ 17). Copies of the French Interviews were previously provided to the Court and counsel as GX 101 and 102, respectively.[3] During these interviews, the defendant, whose face was covered, used the *kunya* "Abu Tayeb."[4]

The French Interviews were arranged by Hostage-2, who served as an interpreter during the interviews and who, as described further below, was later taken hostage by the defendant and his men in November 2008. Hostage-2 was able to arrange the French Interviews because he was a well-connected local resident who served as an intermediary between the international media and the local population, including the Taliban, (*see* PSR ¶ 28)—indeed, Hostage-2 previously photographed the defendant carrying an RPG, depicted below. Hostage-3, who also would later be taken hostage by the defendant and his men, was an Afghan driver hired by Hostage-2 to drive Hostage-2 and the French reporter to these interviews.



---

[3] Transcripts of the French Interviews have been provided as GX 101-T and 102-T. The other exhibits referenced herein were previously provided to the Court and counsel under seal.

[4] A *kunya* is an honorific name, commonly used as a *nom de guerre* by Islamic militants, often derived from the name of a person's child; "abu" means father, therefore Abu Tayeb means "Father of Tayeb." Consistent with his *kunya*, the defendant has a son named Tayeb. Moreover, following the defendant's arrest in this case, the defendant identified himself to law enforcement as the "Abu Tayeb" depicted in the French Interviews.

### 1.    The November 2007 Interview

The November 2007 interview took place in Wardak Province, where the defendant served as a commander. (*See* GX 101 at 00:59-1:07; GX. 101-T at 2). Upon arriving at the location where the defendant and his men (all of whom were armed with machineguns and other weapons) were stationed, the defendant began displaying what he described as his "most powerful anti-tank mine," explaining how the mine functioned to destroy unsuspecting tanks via remote control access. (GX 101 at 4:40-5:08; GX 101-T at 6-7). The defendant told the French reporter, in sum and substance, that he receives his orders from Mullah Omar's righthand man, Mansoor Dadullah; he was in command of approximately 1,300 men; and he hoped to begin "major operations" in Kabul the following year. (GX 101 at 5:18-5:38; GX. 101-T at 7). The defendant also told the reporter that he supervised five provinces in Afghanistan and that the men under his command were a special brigade of Taliban fighters, authorized to carry out attacks anywhere in the country. (GX 101 at 5:47-6:00; GX 101-T at 7-8). A screenshot of the defendant—wearing a black face covering and sunglasses while he was accompanied by other Taliban fighters with machineguns— during the November 2007 interview is below, (GX 101 at 6:20):



During the November 2007 interview, the defendant explained that he and his men were all "fedayeen," who were prepared to carry out suicide bombings and to "use any technique" to advance their cause. (GX 101 at 6:00-6:20; GX 101-T at 8) ("Fedayeen can carry out suicide bombings. We can lose our legs, our hands, our feet. We're ready to use any technique. We're all fedayeen here. Taliban fedayeen.").[5] The defendant told the reporter that one of the men under his command that day was a suicide bomber and that the defendant and his men were "all prepared to die," explaining that there "is no difference between the one who is killed by a bullet and the one who blows himself up." (GX 101 at 9:53-10:19; GX 101-T at 13-14).

### 2.    The September 2008 Interview

Approximately ten months later, in or around early September 2008, the defendant agreed to meet again with the French reporter. As before, Hostage-2 arranged the interview and Hostage-3 served as the driver for the interview. Upon arriving at the meeting location in Wardak Province, the French reporter was greeted by the defendant and numerous Taliban fighters, once again heavily armed with machineguns, RPGs, and other anti-tank weapons. (*See, e.g.*, GX 102 at 1:27-1:50). At the start of the interview, the defendant, once again using the *kunya* "Abu Tayeb," displayed an RPG, which he wielded on his shoulder. The defendant explained the weapon's capabilities, describing that it "destroys ground troops, it burns everything, and makes a lot of light" and noting that the Taliban had been using these weapons for some time. (GX 102 at 2:15-3:00; GX 102-T at 4-5). The defendant further explained that he could use this RPG to shoot at

---

[5] The term "fedayeen" (from the Arabic *fidā'ī*, meaning "one who sacrifices himself") is a term often used to describe militant volunteers, commandos, or guerrilla fighters willing to die for a larger religious, national, or ideological cause

tanks from approximately 600 meters away "without a problem." (*Id.*). Screenshots of the defendant displaying the RPG are below:



(*See* GX 102 at 1:50-2:21).

The defendant then went on to explain that all his men were "fedayeen," that "Americans run away when they see them," and that "these men, if you ask them, are ready to be suicide bombers. They're ready to die.  They'll put on a belt and blow themselves up if we ask them. They're ready for any type of combat."  (GX 102 at 3:00-3:27; GX 102-T at 5).  A screenshot of some of the Taliban fighters under the defendant's command that day is below, (GX 102 at 3:36):



The defendant then brought the French reporter to a remote area in Afghanistan so that the defendant and his men could train with their weapons and show the French reporter how the weapons operated.  (GX 102 6:20-8:00; GX 102-T at 8-9). Screenshots of the defendant firing an RPG and a machinegun are below, (*see* GX 102 at 6:56; 7:48):



After training with their weapons, the defendant and his men brought the French reporter back to their base.  The defendant discussed how he and his fighters targeted American and French troops—including by referencing a specific attack against French troops in the Surobi area east of Kabul in August 2008, warning that future attacks will be "more violent."[6]  (GX 102 at 8:45-9:10; GX 102-T at 10). The defendant also said that "this year, we will do our best to enter Kabul and

---

[6] In that attack, which occurred on or about August 19, 2008, a combined force of French, American, and Afghan troops were ambushed, resulting in the deaths of 10 French soldiers.  *See, e.g.*, https://www.nytimes.com/2008/08/20/world/asia/20france.html.

target the Americans and their allies.  From now on, we are going to move the combat zones from remote areas to the cities." (*Id*.).

The following day, the defendant and his men attacked an Afghan National Police ("ANP") outpost with rockets and automatic weapons in the vicinity of Sayed Abad in Wardak Province, reportedly killing three Afghan police officers.  Before the attack, and as reflected in the video recording of the September 2008 interview, the defendant and his men drove for "about two hours" on "country roads" to the attack location.  (*See* GX 102 at 17:25- 17:40; GX 102-T at 18).  Upon arrival, the defendant assigned weapons and responsibilities to his men. (GX 102 at 17:40-19:00; 20:38-21:00; GX 102-T at 20).  The defendant also said that he would attack the ANP outpost using the RPG he had displayed earlier in the interview.  (GX 102 at 21:20-21:30; GX 102-T at 21).  The defendant and his men then attacked the ANP outpost in the presence of the French reporter.  (GX 102 at 22:00-23:50; GX 102-T at 22-23).  After the operation, when asked by the French reporter whether he organizes attacks against Coalition Forces in a similar manner, the defendant explained, "no, those are easier because we ambush them and so we don't need any defensive positions." (GX 102 at 25:00-25:25; GX 102-T at 25).

The next day, the defendant's men drove with the French reporter past the ANP outpost, which had significant damage.  (GX 102 at 25:51-26:30; GX 102-T at 26) ("And over there is the checkpoint we attacked last night.  You are going to see the result of our operation, it's on the right.").[7]  They then pointed out to the French reporter two other locations on the road where they

---

[7] As reported during the September 2008 interview, three Afghan police officers were killed because of the attack, and two others were wounded.  (Ex. 102-T at 26).  Contemporaneous FBI reporting, produced to the defense in discovery, also reflects that, per open-source research, a

previously destroyed U.S. tanks, including a location where they claimed to have destroyed two American military vehicles. (GX 102 at 26:40-26:53; GX 102-T at 27). Indeed, as described below, in June 2008, Taliban fighters under the defendant's command ambushed a U.S. military convoy in the vicinity of Sayed Abad in Wardak Province (*i.e.*, where the ANP outpost attack also took place), destroying two U.S. military vehicles and murdering three U.S. servicemembers and their Afghan interpreter.

### B.    The June 2008 Convoy Attack

As part of the Taliban's campaign to kill U.S. troops and their allies, Taliban fighters under the defendant's command routinely carried out attacks that were intended to, and which did, result in the deaths of U.S. servicemembers and others. (*See* PSR ¶ 18). The defendant was an outspoken proponent of these deadly attacks, as reflected, for example, in the French Interviews described above. (*See generally* GX 101, 102). The defendant noted how he and his men carried out attacks against Coalition Forces and warned that they were prepared to carry out even more violence, including attacks by suicide bombers. (*Id.*). The material support that the defendant provided to his Taliban fighters—through, among other things, weapons and personnel—made their violent acts of terrorism possible. (*See, e.g.*, Plea Agmt. Ex. A).

One of those attacks was the June 26, 2008 ambush of a U.S. military convoy transiting from Ghazni District to Bagram Airfield. The convoy consisted of three U.S. military vehicles and was traveling along a road that traverses through Wardak Province, where the defendant served as a commander. (PSR ¶ 22). As the convoy reached the vicinity of Sayed Abad in Wardak

---

September 1, 2008 attack on an ANP outpost in Sayed Abad, Wardak Province resulted in the killing of at least 3 police officers.

Province, and consistent with the defendant's stated tactic of ambushing Coalition Forces, (*see* GX 102 at 25:00-25:25; GX 102-T at 25), Taliban fighters under the defendant's command attacked the unsuspecting convoy with IEDs, RPGs, and automatic weapons, (PSR ¶ 22).

The attack was captured, in part, on video by members of the Taliban and was later included in Taliban propaganda videos. (*See, e.g.*, GX 501). As reflected in the video footage, the convoy was attacked with heavy gunfire and roadside explosives. (*See id*. at 2:00-2:45). The attack tragically killed three U.S. Army servicemembers and their Afghan interpreter. (PSR ¶ 22). Two of the U.S. servicemembers were members of the New York National Guard deployed to Afghanistan as part of the Army's ongoing mission to train Afghan partner forces at the time that they were killed. (*Id*.). Several other U.S. servicemembers were injured in the attack. (*Id*.). Two of the three U.S. military vehicles in the convoy were destroyed during the attack. (*Id*.). Screenshots of the two burning U.S. military vehicles are below, (GX 501 at 4:18, 4:28):



15

After the attack, and as partially captured on a Taliban propaganda video, the Taliban fighters celebrated and looted the burning vehicles. (*See, e.g.*, GX 501 at 4:57-6:45). This attack was notably vicious—at least one of the bodies was mutilated by the Taliban fighters and others were severely burned. ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

The defendant reveled in that attack. In the months that followed, the defendant separately told Hostage-2 and Hostage-3 that his men had carried out the attack, which the defendant said resulted in the deaths of U.S. servicemembers. (*See* PSR ¶ 24). For example, while Hostage-3 was with the defendant during the French Interviews, the defendant said, in sum and substance, that his men had carried out an attack against American troops by using mines to blow up their military vehicles and that three Americans had been killed in that attack. The defendant made similar statements to Hostage-2, telling Hostage-2 that his men had ambushed an American military convoy and killed Coalition Forces.

Given the notoriety of this attack, other Taliban members also boasted about how the defendant's men had carried out the attack. For example, while being held hostage by the defendant and his men, as described further below, the defendant's brother, Timor Shah, showed Hostage-3 and others a video of an attack on a U.S. convoy. (PSR ¶ 24). Shah said that the attack, which Shah told Hostage-3 occurred in Wardak Province and was carried out by the defendant's men, resulted in the deaths of three Americans. (*Id.*). And, as described above, in or around early

16

September 2008, during the French Interviews, Taliban fighters under the defendant's command pointed out where along the road in Wardak Province they had carried out an attack that resulted in the destruction of two U.S. military vehicles. (GX 102 at 26:40-26:53; GX 102-T at 27).[8]

### C.    Additional Acts of Terrorism

The defendant also provided material support for other acts of terrorism by the Taliban between 2007 and 2009. As the defendant admitted in connection with his guilty plea, those acts of terrorism included (i) killing U.S. servicemembers, (ii) the use of explosives against U.S. nationals, (iii) destroying U.S. aircraft, and (iv) the hostage taking of civilians. (*See* Plea Agmt. Ex. A). The defendant further admitted that the Taliban fighters under his command "were prepared to, and in some cases did, carry out attacks against U.S. servicemembers, NATO troops, and/or their Afghan allies," using a variety of means and weapons, including suicide bombers, IEDs, RPGs, and automatic weapons. (*Id.*).

For example, as described above, in or around early September 2008, the defendant and his men were video recorded as they prepared for and subsequently carried out an attack on an

ANP outpost in the vicinity of Sayed Abad in Wardak Province using RPGs and other weapons. (GX 102 at 22:00-23:50; GX 102-T at 22-23).[9]  As reflected in the video recording, the defendant oversaw that operation, stationing his men in particular locations and providing them with instructions about how to carry out the attack.  (*Id*.).  He also personally participated in the attack, which reportedly resulted in the murder of at least three Afghan police officers.  (*Id*.).  And as reflected in the French Interviews, the defendant issued stern warnings to those who chose to side with the Americans, threatening to increase his attacks and make them "more violent."  (GX 102 at 8:45-9:10; GX 102-T at 10).

As another example, and consistent with the defendant's admission to having provided material support to acts of terrorism aimed at destroying U.S. aircraft, on or about October 27, 2008, Taliban fighters shot down a U.S. military helicopter in the vicinity of Sayed Abad in Wardak Province.  (PSR ¶ 25).  As described above, both the June 2008 convoy attack and the September 2008 attack on the ANP outpost also occurred in the vicinity of Sayed Abad.  The helicopter attack was carried out using RPGs and, although the helicopter was able to land safely, it sustained considerable damage and needed to be airlifted away from the attack site.  (*Id*.).

---

[9] As discussed further below, the defendant asserts in his sentencing submission that the location of the June 2008 convoy attack indicates that he was less likely to have been involved in that attack.  (*See* Def. Mem. at 22-23).  But both the June 2008 convoy attack and the attack on the ANP outpost occurred in the vicinity of Sayed Abad in Wardak Province, and the defendant is on a video recording preparing, organizing, and carrying out the attack on the ANP outpost in Sayed Abad.  (*See* GX 102 at 17:40-23:50).  Moreover, the French reporter noted that the defendant and his men drove for "about two hours" to reach the ANP outpost attack location, (*see* GX 102 at 17:25- 17:40; GX 102-T at 18), demonstrating that the defendant and his men were willing to travel to carry out their attacks in the vicinity of Sayed Abad.  He thus cannot credibly deny the fact that he and his men carried out attacks in the area where the June 2008 convoy attack occurred.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████  The Taliban also

issued a statement claiming responsibility for downing the helicopter, asserting that it was "shot

down [by] the mujahideen of the Islamic Emirate." (PSR ¶ 26). The Taliban falsely claimed that

"[a]ll those onboard were killed," when, in fact, no troops died as a result of the attack. (*Id.*).

█████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████

-------------------------

[10] ███████████████████████████████████████████████████████
█████████████████████████████████

19

III.    **The Hostage Taking**

The defendant's material support for acts of terrorism during this period was not limited to attacks on military and law enforcement personnel.  As the defendant also admitted in his guilty plea, his material support additionally extended to the hostage taking of civilians by members of the Taliban.  (*See* Plea Agmt., Ex. A).  Indeed, as described further below, for over seven months, the defendant spearheaded, and subsequently pled guilty to, the hostage taking of Hostage-1, Hostage-2, and Hostage-3—a months-long course of terrifying criminal conduct that he led alongside the most senior leaders of the Haqqani Network to try to compel ransom payments and the release of Taliban prisoners.  (*Id.*).

A.  **The Defendant Engineers the Hostage Taking**

At the time of his capture, Hostage-1 was a prominent investigative journalist for *The New York Times*.  (PSR ¶ 27).  He was an experienced reporter who had spent considerable time in various conflict zones, including Bosnia and Afghanistan.  In the latter half of 2008, Hostage-1 was conducting research for a book he planned to write regarding efforts to bring stability to Afghanistan.  (*Id.*).  As part of the research for his book, Hostage-1 sought to arrange an interview with a Taliban commander because Hostage-1 was interested in exploring the U.S.-led effort in Afghanistan from the point of view of residents of Helmand Province in Afghanistan, including members of the Taliban.  (*See id.*).

On or about November 9, 2008, Hostage-1 arranged a meeting in Kabul with Hostage-2, a well-connected local resident who served as an intermediary between the international media and the local population, including the Taliban, and also worked with *The Times* of London. (*See* PSR ¶ 28).  Hostage-2 had worked with other journalists known to *The New York Times* in the past and

20

had arranged interviews with the defendant (who as described above, at times went by the *kunya* "Abu Tayeb") for other Western reporters without issue. These prior interviews included the French Interviews described above. Hostage-2 frequently used Hostage-3 as his driver for these interviews. In the ordinary case, as was the case with the French Interviews described above, Hostage-2 and Hostage-3 would drive the reporter and any camera crew from Kabul to a previously agreed upon area in the rough vicinity of where the interview was to occur. (PSR ¶ 28). Once in the general area, Hostage-2 would ensure the safe passage of the reporter and the camera crew through Taliban-controlled territory, to the specific location of the interview; Hostage-2 would then serve as the translator during the interview. (*Id.*).

The defendant told Hostage-2 that he would be willing to meet with Hostage-1 on November 10, 2008. (PSR ¶ 28). At approximately 7:00 a.m. that day, Hostage-1, -2, and -3 set off from Kabul to meet with the defendant. (PSR ¶ 30). Before leaving for the interview, Hostage-1—who had been the victim of a hostage taking years earlier in Bosnia—left a letter at the *New York Times* Kabul Bureau, listing the defendant's *kunya* ("Abu Tayeb"), the location of the meeting, and Hostage-1's and Hostage-2's cellphone numbers. (*Id.*). The letter stated, in part, "If I get kidnapped don't publicize it. That will be easier for [my wife] + my family. Please read attached note to [my wife] if something goes wrong . . . . If I'm not back by dark call the embassy . . . . Hopefully, this will be fine." (*Id.*). The note that Hostage-1 left behind for his wife (and which was later transmitted to her after Hostage-1 was taken captive) stated, in part, the following:

> If I get kidnapped, use money from my book advance. Do not involve money from your family or mine. This is my responsibility. I love you so much and am sure this will be ok. Please go and be happy and move forward if things go very wrong.

21

I love you so very much and thank you for giving me more joy and love than I've ever known.

Instead of sitting for an interview with Hostage-1, however, the defendant directed his men to kidnap Hostage-1, -2, and -3. (PSR ¶ 31). Specifically, when they arrived at the agreed-upon meeting point, Hostage-2 called "Abu Tayeb" who told Hostage-2 that there was a U.S. military operation in the area and that they should proceed to a second location. (PSR ¶ 32). As they drove to the second location, they were met by Taliban fighters armed with machineguns who kidnapped them, confiscated their cellphones, tied their hands behind their backs, and blindfolded them. (*Id.*). The hostages were held at gunpoint and transported to a house. (*Id.*). At one point during the drive, after Hostage-1 told the armed kidnappers that he was American, one of them raised his fist in the air and shouted in Pashto that they were "going to send a blood message to Obama."[11]

Once they arrived at the house, the defendant entered the room with his face covered and identified himself as "Atiqullah." (PSR ¶ 33). The defendant accused all three captives of being spies and declared them to be his prisoners. (*Id.*). That afternoon, the defendant used one of the hostages' cellphones to call the *New York Times* Kabul Bureau. During these calls, which were not recorded, the defendant identified himself as "Commander Atiqullah" and told an Afghan staff member that the three men were his prisoners because they were serving as intelligence agents for

---

[11] *See, e.g.*, *Held by the Taliban, Part One: 7 Months, 10 Days in Captivity*, (Oct. 17, 2009), *available at* https://www.nytimes.com/2009/10/18/world/asia/18hostage.html. The details of the hostages' captivity, and in particular, Hostage-1's interactions with the defendant throughout the hostage taking, are also recounted in detail in a 2010 book co-authored by Hostage-1 and his wife titled "A Rope and a Prayer, a Kidnapping from Two Sides."

the Coalition Forces and that the "Islamic Emirate" would decide their fate. (PSR ¶ 36).[12]  The defendant also permitted the hostages to speak with staff at the *New York Times*' Kabul Bureau to confirm that they were alive and well.  (*Id*.).  The next day, the defendant interrogated the hostages for family-related information.  (PSR ¶ 37).

Although the defendant's face was covered on the day of the hostage taking, Hostage-2 and Hostage-3—who had interacted with the defendant during prior interviews with journalists, as described above—recognized the defendant's voice; however, they did not disclose that they knew it was the defendant to Hostage-1 for several weeks because, as they later informed Hostage-1, the defendant had threatened to behead them if they disclosed his identity to Hostage-1.  (PSR ¶ 34).

### B.  The Captivity

As reflected in the PSR, over the course of the next approximately seven months, the defendant and his co-conspirators held the hostages captive with the aim of trying to compel ransom payments and the release of Taliban prisoners.  During their captivity, the hostages obeyed the orders of the defendant and his co-conspirators for fear of being killed or beaten.

While there were a range of Taliban and Haqqani Network fighters present at various stages of the captivity—including Badruddin, one of the highest-ranking members of the Haqqani Network—the defendant made clear that the hostages were his prisoners.  (PSR ¶ 36).  The defendant and his network of fighters also constantly moved the hostages around, including by forcing them to hike across mountainous terrain in the middle of the night, eventually moving the hostages to the federally administered tribal areas of Pakistan, where the Haqqani Network and

---

[12] The PSR incorrectly states that these calls were recorded.  They were not.  The Government respectfully requests that this change be reflected in Paragraph 36 of the PSR.

Taliban insurgents like the defendant operated with impunity.  (*See* PSR ¶¶ 37-44).

The hostages were then held in various safehouses associated with the Haqqani Network in the North and South Waziristan regions of Pakistan, including in Miran Shah, a notorious Haqqani Network stronghold.  (PSR ¶¶ 37-44).  The conditions at each of these locations varied, and the hostages were forced to perform chores such as cooking and cleaning.  (*See, e.g.*, PSR ¶ 41).  They were constantly under watch and were often forced to stay within the small confines of whichever safehouse they were being kept in at the time.  (*Id.*).  At times, they could hear drone planes in the sky above and the guards made clear that they were in constant fear that they would be targeted.  (PSR ¶ 44).  There was at least one drone strike that hit near the compound where the hostages were being held, causing their captors to quickly move everyone to another location.  (*Id.*).  On two different occasions, first Hostage-3 and then Hostage-2 attempted unsuccessfully to escape when the guards were distracted.  (*Id.*).

Co-defendants Akhund Zada (who remains at large) and Timor Shah (who is deceased) both reported to the defendant during the hostage taking.  Zada served as the defendant's second-in-command during the hostage taking, while Shah—the defendant's younger brother—served as one of the head guards of the three hostages.  (PSR ¶ 35).  At all times, the hostages were guarded by Taliban fighters under the defendant's command armed with machines and other weapons.  (PSR ¶ 41).

Throughout their captivity, the defendant and his co-conspirators regularly lied to the hostages about the status of negotiations concerning their potential release.  And as described further below, the defendant and his co-conspirators forced the hostages to convey the Taliban's lofty demands by phone call and proof of life videos, on multiple occasions.  At times, Badruddin

24

also called the *New York Times* Kabul Bureau to convey the Taliban's demands. (PSR ¶ 38). The defendant and his men also regularly spoke to the hostages about their disdain for the West; indeed, Taliban fighters under the defendant's command would often show the hostages Taliban propaganda videos of beheadings and attacks that the Taliban had carried out against Coalition Forces. (*See* PSR ¶ 40). For example, as described above, on at least one occasion, Shah showed Hostage-3 a video of the June 2008 convoy attack, stating that the defendant's men had carried out the attack and killed three U.S. servicemembers. (*See* PSR ¶ 24).

The hostages often took various measures to try to get their captors, including the defendant, to reach an agreement for their release. For example, at one point during the hostage taking in or around early December 2008, Hostage-1 and Hostage-2 began a hunger strike that lasted a short period. Hostage-1 also pretended to be sick and induced vomiting. (PSR ¶ 37). Hostage-1 even faked a suicide attempt by trying to hang himself. (PSR ¶ 42). The suicide attempt backfired, however, with Badruddin become enraged at Hostage-1 and accusing Hostage-2 of having directed Hostage-1 to fake a suicide. (*Id.*).

The defendant also spoke to Hostage-1 about his reasons for having carried out the hostage taking. As reported in Hostage-1's subsequent publications about the hostage taking, in or around December 2008, the defendant told Hostage-1 that he believed the U.S. military had mounted an operation to arrest the defendant on the day of the interview with Hostage-1.[13] The defendant falsely accused Hostage-1 of having sent text messages to tip off the American military of the

---

[13] *See, e.g.*, *Held by the Taliban, Part Two: Inside the Islamic Emirate*, (Oct. 18, 2009), *available at* https://www.nytimes.com/2009/10/19/world/asia/19hostage.html.

defendant's location and of being a spy, along with other employees of *The New York Times*.  (*Id.*).

The defendant also told Hostage-1 that his men were prepared to carry out a suicide attack on the

*New York Times*' Kabul Bureau, which he could set off with a single phone call, and that his men

had nearly kidnapped a staff member of *The New York Times* Kabul Bureau, but that she had left

the interview just before they arrived.  (*Id.*).

Finally, although Hostage-1 was not physically abused during his captivity, the Taliban

members under the defendant's command beat Hostage-2 and Hostage-3 at times during the

hostage taking.  (PSR ¶ 49).  For example, on or about November 11, 2008, the three hostages

were interrogated by the defendant, Akhund Zada, and others, for family information. (PSR ¶ 37).

After the interrogation, the defendant and Zada left the home and did not return for several days.

(*Id.*).  During this period, Hostage-2 attempted to use the cellphone of one of the guards to try to

send a text message to the *New York Times*' Kabul Bureau but was discovered.  (*Id.*).  As a result,

the guard struck Hostage-2 repeatedly with the butt of his rifle.  (*Id.*).

## C.    Ransom Calls and Proof of Life Videos

As described above, and as the defendant has admitted in connection with his guilty plea,

the defendant sought to use the hostages to try to obtain ransom payments and the release of

Taliban prisoners.  (*See* Plea Agreement, Ex. A).  During the hostage taking, the defendant and

Badruddin worked hand in hand to use the hostages as pawns for their negotiations, forcing the

hostages to make ransom calls and proof of life videos conveying the Taliban's demands and

warning that, if those demands were not met, they would be killed.

The first ransom call occurred on or about November 19, 2026, after the defendant had

moved the hostages from Afghanistan into Pakistan.  That day, the defendant and Badruddin drove

the hostages to a remote area and told Hostage-1 to call his wife using a satellite phone that they provided. Hostage-1 was instructed to tell his wife, among other things, that they were being treated well, not to use force to try to save the hostages, and to "make a deal now" or "they will make it public." (GX 301 at 00:28-1:50). Hostage-1 further told his wife that "they said I can't call you again. They want a deal now." (*Id*. at 1:50-2:00).

Shortly after that call, the defendant and Badruddin instructed Hostage-1 to call the *New York Times* Kabul Bureau. The call lasted approximately 35 minutes. On that call, Hostage-1 conveyed the defendant's and Badruddin's instructions and demands to a staff member. Hostage-1 told the staff member, in part, (i) that "the deal must be for all three of us," (ii) "do not use force to get us," and (iii) "keep it quiet and if you don't make a deal quickly they will put it in the media and it will create a political problem." (GX 302 at 1:00-2:00). Hostage-1 also implored the staff member to "make a deal as quickly as you can, this is my last phone call to you," and conveyed that "they want prisoners and money." (*Id*. at 2:00-4:00). After Hostage-2 and Hostage-3 also spoke with the *New York Times* staff member to confirm they were alive, Hostage-1 relayed that "they [*i.e.*, the defendant and Badruddin] are telling us to tell you that we are in terrible conditions and to please help us" because "they are threatening to kill the driver [*i.e.*, Hostage-3] and the translator [*i.e.*, Hostage-2], and I have to tell you." (*Id*. at 10:40-19:02).

In or around December 2008, Badruddin forced the hostages to appear in the first proof of life video, threatening to kill Hostage-3 if Hostage-1 did not appear in the video. (PSR ¶ 41). In the video, the hostages sat on the floor while Taliban fighters pointed machineguns at their heads. (GX 201). In Hostage-1's portion of the video, Hostage-1 said that he had been a "captive for the last 34 days. The conditions are very bad. They are moving us through the mountains. They won't

let us make any phone calls and it's very cold and very difficult.  I appeal to my office and I appeal to President Bush and President Elect Obama to please meet their demands.  If you don't meet their demands, they will kill all of us.  Please meet their demands." (GX 201A, 201A-T).  Hostage-2 and Hostage-3 were forced to make similar statements.  (*See* GX 201B, 201B-T, 201C, 201C-T).  A screenshot from the proof of life video is below:



Several weeks later, in or around January 2009, Badruddin transported the hostages to a mountain location nearby to record the second proof of life video.  (*See* PSR ¶ 43; GX 202).  This video, like all the proof of life videos, was entirely scripted, and this one was intended to give the false impression that the hostages were being held in the mountains and forced to travel frequently in harsh conditions.  (*Id.*).  At the start of the video, Hostage-1, seated between the other two hostages with machineguns pointed at them, pleaded for the U.S. government to "meet the Taliban demands" and to "please save all three of us."  (GX 202 at 00:00-3:53; GX 202-T at 2-3).  Hostage-1 described, in part, that "we're being held in very difficult conditions, in the mountains of

28

Afghanistan. . . . All three of our lives are in great danger." (*Id*.).  Later in the video, the hostages are depicted walking through the snow in the mountains and huddled up outside.  (*See* GX 202).  Badruddin and the defendant's brother, Timor Shah, were present for the filming of this video and transported the hostages across the snow-covered terrain.  (PSR ¶ 43; *id*. at 35).  A screenshot of the hostages during this proof of life video is below:



Around this same time, Badruddin had also directed Hostage-1 to send a letter to his wife through the International Red Cross. The letter, like the ransom calls and proof of life videos, similarly conveyed the Taliban's demands and falsely stated that the hostages were being held in the mountains of Afghanistan.  (*See* GX 401).  In addition to identifying the Taliban's specific demands, the letter stated, in part, that "if their demands are not met they will kill the three of us. They are telling me to tell you to hurry up and meet their demands."  (*Id*.).

On or about February 16, 2009, the defendant drove Hostage-1 to a remote location in Pakistan so that Hostage-1 could call his wife and convey the defendant's demands for ransom.

29

(*See* PSR ¶ 45).  During this 20-minute call, Hostage-1 told his wife, at the defendant's direction, that this was his "last call" and "last chance."  (GX 303 at 2:45-2:50).  Hostage-1 conveyed that the defendant was "going to lead the negotiations now" and that "if this doesn't work, they're going to kill us."  (GX 303 at 3:40-5:35).  When Hostage-1's wife said that the family had raised a certain amount of money, Hostage-1 said that his captors thought the amount was a joke, and that they had previously obtained much higher ransoms for other foreign hostages.  (PSR ¶ 45).  Hostage-1 and his wife then reviewed a list of family friends, co-workers, and acquaintances who could potentially donate more money toward the ransom payment.  (PSR ¶ 45).

In or about April 2009, the defendant forced Hostage-1 to appear in the third proof of life video during which he told Hostage-1 to pretend to cry.  (*See* PSR ¶ 46; GX 203).  The defendant directed the video and told Hostage-1 what he needed to say.  (*Id.*).  In the video, Hostage-1 had a machinegun pointed inches from his face and sobbed as he said, "this is my proof of life video. Maybe another video will come that will be very bad.  If this message does not help, I cannot say what will happen to me. . . . [P]lease meet their demands . . . my life is in danger."  (GX 203 at 00:00-:45, 203-T at 2).  Hostage-1 went on to say, at the defendant's direction, "Meet their conditions.  Otherwise, I'm finished.  If you don't help me, I will die.  Now, the key is in your hand. . . . If you do not meet their demands, you will be responsible for my killing, not the Taliban. Please help me, please have mercy on me.  Do not shed my blood.  Please, save me.  I want to go home." (GX 203 at 1:40-2:40, 203-T at 3).  A screenshot of Hostage-1 from the proof of life video

that the defendant directed is below:



In or around late May 2009, the defendant forced Hostage-1 to appear in the fourth and final proof of life video. (*See* PSR ¶ 48; GX 204). During this video, which featured Hostage-1 only and was also filmed and directed by the defendant, Hostage-1 implored a relative of a foreign government official to help facilitate the hostages' release. (*See id*.; *see also* GX 204-T). Before the video ended, Hostage-1 addressed his loved ones, saying, "However this ends . . . my family and friends should live at peace with yourself. I know you have done absolutely everything you can to help us." (GX 204 at 1:03-1:15; GX 204-T at 2). The video ended with Hostage-1 once again pleading with the relative of the foreign official for assistance with their release. (GX 204 at 1:35-1:50).

## D.    The Escape

A short time thereafter, in June 2009, the hostages were moved to another compound in Miram Shah. After they arrived, and while sweeping and cleaning the compound, Hostage-1 found

31

a car tow-rope. Having lost hope about the prospect of an imminent release, and thinking that the rope could be of potential use for an escape, Hostage-1 hid the rope under a pile of clothing.[14] Hostage-1 and Hostage-2, who had been discussing potential escape opportunities for some time, decided to try to use the rope to scale down the wall of the compound.[15] (PSR ¶ 50). To effectuate this plan, on or about June 19, 2009, Hostage-1 and Hostage-2 waited until the guards were asleep. (PSR ¶ 51). Hostage-1 and Hostage-2 then surreptitiously went to the roof of the compound and used the rope to get over the wall and down to the street. (*Id.*). On previous trips outside of the compound with the guards, Hostage-2 had noticed a Pakistani army installation nearby. (*Id.*). After scaling the wall, Hostage-1 and Hostage-2 eventually made it to the guardhouse, where they were taken in by the Pakistani guards. (*Id.*). They were then transported to meet with U.S. authorities and to be reunited with their families.

Timor Shah, the defendant's brother, was one of the guards on duty the night that Hostage-1 and Hostage-2 escaped. (PSR ¶ 52). When Shah awoke the next morning and saw that Hostage-1 and Hostage-2 were gone, he began to shout to alert the other guards. (*Id.*). Shortly thereafter, Hostage-3 was placed in a jail and interrogated about the escape. (*Id.*). Thereafter, Shah and the other guards who were on duty the night before were also placed in the jail and interrogated. (*Id.*). Approximately two weeks later, Shah was removed from the jail and reportedly transferred to another jail. (*Id.*).

---

[14] *See, e.g.*, *Held by the Taliban, Part Five: A Rope and a Prayer*, (Oct. 21, 2009), *available at* https://www.nytimes.com/2009/10/22/world/asia/22hostage.html.

[15] Hostage-1 and Hostage-2 decided not to include Hostage-3 in this plan at the time out of concern that Hostage-3 might inform the guards. (PSR ¶ 50).

In or around late July 2009, about five weeks after his fellow hostages escaped and after the defendant was no longer present, Hostage-3 was allowed to work outside during the day with the guards. (PSR ¶ 53). One day, a firefight broke out nearby that distracted the guards. (*Id*.). Hostage-3 ran away, finding a cab that took him to the Khost, Afghanistan border crossing. (*Id*.). At the border crossing, Hostage-3 sought the assistance of the border police who later transported him to a military base in Khost, where he reported his experiences to U.S. personnel. (*Id*.).

## PROCEDURAL HISTORY

### A.  Charges and the Defendant's Arrest

On June 17, 2014, the defendant was charged, along with Zada and Shah,[16] in a six-count sealed indictment (the "June 2014 Indictment") with the following offenses: (1) hostage taking, in violation of 18 U.S.C. § 1203; (2) conspiring to commit hostage taking, in violation of 18 U.S.C. § 1203; (3) kidnapping, in violation of 18 U.S.C. § 1201; (4) conspiring to commit kidnapping, in violation of 18 U.S.C. § 1201; (5) possession of a machinegun during and in relation to kidnapping, in violation of 18 U.S.C. §  924(c); and (6) possession of a machinegun during and in relation to hostage taking, in violation of 18 U.S.C. § 924(c).

On October 7, 2020, the defendant traveled to Ukraine.  Upon landing in Ukraine, Ukrainian authorities detained the defendant in connection with the charges in the June 2014 Indictment.  On October 27, 2020, the FBI took custody of the defendant and transported him to the Southern District of New York.  The defendant arrived at Stewart International Airport in this District on October 27, 2020.  The following day, on October 28, 2020, the defendant was

---

[16] Badruddin Haqqani was killed in or about 2011, and was not charged for his role in the hostage taking.

presented before United States Magistrate Judge Ona T. Wang and the June 2014 Indictment was unsealed.

On October 7, 2021, after Ukraine waived the rule of specialty and granted authorization to bring additional charges against the defendant, the defendant was charged in a thirteen-count sealed superseding indictment (the "October 2021 Superseding Indictment") with: (1) conspiring to provide material support for acts of terrorism resulting in death, in violation of 18 U.S.C. § 2339A; (2) providing material support for acts of terrorism resulting in death, in violation of 18 U.S.C. § 2339A; (3) conspiring to murder U.S. nationals, in violation of 18 U.S.C. § 2332(b); (4) murder of U.S. nationals, in violation of 18 U.S.C. § 2332(a); (5) murder of U.S. servicemembers, in violation of 18 U.S.C. § 1114; (6) attempted murder of U.S. servicemembers, in violation of 18 U.S.C. § 1114; (7) conspiring to destroy aircraft, in violation of 18 U.S.C. § 32; (8) destruction of aircraft, in violation of 18 U.S.C. § 32; (9) conspiring to use weapons of mass destruction, in violation of 18 U.S.C. § 2332a;  (10) conspiring to commit hostage taking, in violation of 18 U.S.C. § 1203; (11) hostage taking, in violation of 18 U.S.C. § 1203; (12) conspiring to commit kidnapping, in violation of 18 U.S.C. § 1201; and (13) kidnapping, in violation of 18 U.S.C. § 1201.  On October 15, 2021, the defendant was arraigned on the charges in the October 2021 Superseding Indictment.

**B.     The Defendant's Rule 12 Motions and Attempt to Obstruct Justice**

While the defendant's case was pending, and in connection with a motion to suppress his post-arrest statement, the defendant submitted a sworn affidavit that stated, in part, that he had not been advised of his *Miranda* rights prior to questioning by the FBI and that a discussion about his *Miranda* rights did not occur until approximately two hours into the interview.  The defendant has

since stipulated in connection with his guilty plea that he made false statements in the affidavit. (*See* Plea Agmt. at 6).

On April 18, 2024, the Court held a suppression hearing at which Task Force Office James Wyka, who conducted the defendant's post-arrest interview, testified about, among other things, reading the defendant his *Miranda* rights before any questioning and confirming that the defendant understood his rights. (*See, e.g.* April 18, 2024 Hr'g Tr. at 30). The defendant also elected to testify at the hearing. During his testimony, the defendant made false statements under oath. For example, on direct examination, the defendant testified that, at the time of his post-arrest interview, he did not understand the *Miranda* rights he was waiving and that he was not advised of his rights prior to being questioned. (*See id*. at 112-113).

On May 6, 2024, the Court denied the defendant's motion to suppress. In doing so, the Court found that it did not "fully credit the testimony" of the defendant. (May 6, 2024 Tr. at 13). The Court noted that the defendant sometimes "focused on providing the testimony that he believed would be beneficial to his arguments rather than factual, truthful testimony, and it caused me to regard some of his answers with suspicion." (*Id*.). The Court also found that "[t]here were other topics on which Mr. Najibullah testified that are undercut or refuted by the testimony of Mr. Wyka, and among these are the assertion that Mr. Najibullah was not advised of his Miranda rights until two hours into the flight. On this issue, I believe Mr. Wyka's timeline." (*Id*. at 14).

The defendant also filed a motion to dismiss certain charges in the October 2021 Superseding Indictment arguing that he was a lawful enemy combatant and immune from prosecution on those charges. On November 1, 2024, following extensive briefing and an evidentiary hearing, the Court denied the defendant's motion. The Court found that the conflict in

35

Afghanistan during the relevant period was a non-international armed conflict and, therefore, the protections claimed by the defendant under the Geneva Conventions did not apply to him. (*See* Nov. 1, 2024 Tr. at 25).

The Court also denied the defendant's due process arguments. In doing so, the Court held that, because the Taliban was "nothing more than an insurgent group engaged in an effort to overthrow the lawful government of Afghanistan" during the relevant period, the defendant was on notice that the killing of U.S. servicemembers was "an act condemned by the international community and indeed criminal." (*Id*. at 26-27). As the Court recognized, the defendant "was, by no means, ensnared by a trap laid for the unwary. He had fair notice sufficient to satisfy due process." (*Id*. at 27).

### C.      The Defendant's Guilty Plea

On April 25, 2025, the defendant pled guilty to Count Two (material support to acts of terrorism resulting in death) and Count Eleven (hostage taking) of the October 2021 Superseding Indictment, pursuant to a plea agreement (the "Plea Agreement"). As part of the Plea Agreement, and consistent with the offense conduct described above, the defendant admitted the following facts:

- With respect to Count Two, between 2007 and 2009, the defendant provided material support to acts of terrorism in Afghanistan and Pakistan by providing property, services, weapons, explosives, and/or personnel to Taliban members knowing and intending that they would be used in furtherance of (i) killing U.S. servicemembers, (ii) the use of explosives against U.S. nationals, (iii) destroying U.S. aircraft, and (iv) the hostage taking of Hostage-1, Hostage-2, and Hostage-3  The defendant further admitted that U.S. servicemembers were killed as a result of the material support that he knowingly and intentionally provided.

- With respect to Count Two, between in or around 2007 and 2009, the defendant served as a Taliban commander in Afghanistan's Wardak Province. During that period, Taliban fighters under the defendant's command were prepared to, and in some cases did, carry out

36

attacks against U.S. servicemembers, NATO troops, and/or their Afghan allies using, among other things, (i) suicide bombers, (ii) automatic weapons, (iii) IEDs, and (iv) RPGs and other anti-tank weapons and explosives, including against U.S. military helicopters.

- With respect to Count Eleven, from on or about November 10, 2008, up to and including in or about July 2009, the defendant knowingly and intentionally seized and detained, and threatened to kill or injure, Hostage-1, Hostage-2, and Hostage-3 in Afghanistan and Pakistan, in order to compel ransom payments and the release of Taliban prisoners by the United States Government. The defendant further admitted that, during this period, he forced the hostages to, among other things, convey the Taliban's demands in proof of life videos.

(*See* Plea Agmt., Ex. A). In addition, the defendant further agreed not to contest at sentencing that, "as a result of the material support provided by the defendant," Taliban fighters "under the defendant's command" carried out the June 2008 convoy attack, resulting in the deaths of three U.S. servicemembers and their Afghan interpreter. (*Id.*).

The Plea Agreement also included a stipulated Guidelines sentence of life imprisonment. (*See* Plea Agmt. at 7). The parties stipulated that Counts Two and Eleven are grouped together because they involved the same victims (*i.e.*, the hostages) and two or more acts connected by a common criminal objective. (*Id.* at 6). The parties further stipulated that the base offense level for Count Two, which included various predicate offenses, is 61, and that the base offense level for Count Eleven is 56, resulting in a combined offense level of 61. (*Id.*). With respect to enhancements, the parties stipulated that, (i) because the defendant was an organizer or leader of criminal activity, four levels are added, and (ii) because the defendant willfully attempted to obstruct justice by making false statements in connection with his motion to suppress his post-arrest statements, through both his affidavit and his false testimony, two levels are added. (*Id.*). The parties also stipulated that because the defendant attempted to obstruct justice, he is not entitled to a decrease in his offense level for acceptance of responsibility. (*Id.* at 7). Accordingly,

37

the parties agreed that the offense level is 67; however, because the maximum offense level authorized by the Guidelines is 43, the total offense level applicable to the defendant is 43.  (*Id*.). In addition, because the offenses charged in Counts Two and Eleven involved federal crimes of terrorism, the parties agreed that the defendant's Criminal History Category is VI.    (*Id*.).  As a result, the stipulated Guidelines sentence is life imprisonment. (*Id*.).

At his change of plea proceeding, the defendant admitted under oath the following facts that formed the basis of his guilty plea:

> [B]etween 2007 and 2009, in Afghanistan and in Pakistan, I provided material support to the Taliban, including weapons and myself as personnel, knowing and intending that my support would be used to attack and kill United States soldiers occupying Afghanistan.  As a result of material support I provided to the Taliban, U.S. soldiers were killed.  The material support I provided also included my role as a commander for the Taliban in Afghanistan's Wardak Province, where the fighters under me were prepared to, and sometimes did, conduct attacks against U.S. soldiers and their allies using suicide bombers, automatic weapons, and improvised explosive devices and rocket propelled grenades.

> I also participated in the hostage taking of [Hostage-1] and his companions on November 10, 2008, on behalf of the Taliban to demand ransom money and the release of Taliban prisoners by the United States government.  I created proof of life videos of [Hostage-1] and his companions in which they were forced to convey the Taliban's demands.

(April 24, 2025 Tr. at 41-42).  The defendant also admitted that, at the time he engaged in this conduct, he knew it was illegal.  (*Id*. at 42).

## THE PSR

### I.   The Probation Department's Guidelines Calculation and Recommendation

On June 2, 2026, the Probation Department issued its final revised PSR.  Consistent with the Plea Agreement, the Probation Department calculated a Guidelines sentence of life imprisonment, based on a total offense level of 43 and a Criminal History Category of VI.  (*See*

PSR ¶¶ 60-88; *Id*. at 37).    In doing so, and while agreeing that all of the relevant Guidelines enhancements in the Plea Agreement were appropriate, the Probation Department determined not to group Counts Two and Eleven.  (PSR ¶ 61) (finding that "Counts 2 and 11 represent separate harms and victims and cannot be grouped" together).  As a result, the combined adjusted offense level in the PSR is 68 (*i.e.*, one point higher than the combined adjusted offense level in the Plea Agreement).  (PSR ¶ 81).  The Probation Department also concluded that, "[a]s of completion of the presentence investigation, the defendant has not clearly demonstrated acceptance of responsibility for the offense," and thus is not entitled to a reduction in the offense level for acceptance of responsibility.  (PSR ¶ 83).  Nevertheless, because this case is one of "those rare instances where the total offense level is calculated in excess of 43," and consistent with the Plea Agreement, the Probation Department concluded that the total offense level is 43. (PSR ¶ 84).[17]

---

[17] The Government stands by the Guidelines calculation in the Plea Agreement, which stipulated to a combined adjusted offense level of 67, which is capped at 43.  In particular, because the defendant's material support for acts of terrorism in Count Two also captured the material support that he provided in connection with the hostage taking in Count Eleven, the two counts have some overlapping victims and acts connected by a common criminal objective or constituting part of a common plan or scheme.  *See* U.S.S.G. § 3D1.2 (noting that counts should be grouped together when the "counts involve the same victim and the same act or transaction" or the "counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan").  Here, the hostage taking of Hostage-1, -2, and -3 serves as a basis for both counts and thus can be grouped together under Section 3D1.2. Moreover, the fact that Count Two contains a broader set of victims than Count Eleven should not preclude the grouping of these counts together given the overlapping victims.  *See United States v. Irving*, 554 F.3d 64, 73 (2d Cir. 2009) (noting that the defendant's "trip to Honduras involved the same transaction *and the same or overlapping victims* and thus were required to be grouped for calculation of a single combined offense level") (emphasis supplied). Accordingly, the Government respectfully submits that Counts Two and Eleven should be grouped, but notes that the determination of whether or not they are in fact grouped does not impact the resulting total offense level of 43.

39

The Probation Department recommends a Guidelines sentence of life imprisonment on each of Counts Two and Eleven, with both terms to run concurrently. (*See* PSR at 37). In formulating its recommendation, the Probation Department "considered both the aggravating and mitigating sentencing factors in this case," including the defendant's leadership role in the offense, the gravity of the offense, the defendant's upbringing, and the information contained in the classified addendum to the PSR. (*Id.* at 38). The Probation Department found that the defendant's "involvement in the instant offense was not an isolated incident of poor judgment." (*Id.*). Instead, it involved a repeated course of conduct that was intended to, and did, result in "harm, death, and destruction." (*Id.*). The Probation Department described the defendant's actions in this case as "inexplicable and inexcusable," aptly noting that the "victims of these acts and their families will be forever changed physically, emotionally, and mentally." (*Id.*). In addition, the Probation Department concluded that the defendant "poses a substantial danger to the community, and he has consistently demonstrated a willingness to engage in violence." (*Id.*). The Probation Department also took into consideration the defendant's attempt to obstruct justice in connection with his motion to suppress his post-arrest statements, concluding that the defendant's "efforts to thwart the prosecution of the instant offense represents a criminal mindset and a blatant attempt to deceive the Court." (*Id.*). Finally, the Probation Department urged the Court to consider the "predatory and violent nature" of the defendant's crimes as "aggravating factors" that support a Guidelines sentence of life imprisonment. (*Id.*).

## II.    The Defendant's Objections to the PSR are Meritless

The Probation Department first disclosed the PSR in unclassified form on April 10, 2026. The defense submitted objections on April 24, 2026, and the Government provided its responses

to the defense's objections on May 1, 2026.  The parties then conferred and agreed to proposed

modifications addressing many of the defendant's initial objections, which Probation incorporated

into the PSR.  The Probation Department also responded to the parties' positions on the defendant's

objections and incorporated its decisions as to each objection into the PSR.  (*See* PSR at 29-36).

Each of the defendant's objections was overruled by the Probation Department.  (*See id.*).  To the

extent the defendant stands by his prior objections, the Government addresses each in turn below.[18]

- **Paragraph 10**: The defense acknowledges that this paragraph is accurate.  However, the defense requests the inclusion of a historian's view that the "rise of the Taliban . . . was received as a welcome change" in Afghanistan.   The historian's view on whether certain individuals viewed the Taliban as a "welcome change" is irrelevant to sentencing.  In any event, the defense has repeatedly cited the historian's views throughout its sentencing submission, and the defendant's own views about the rise of the Taliban.  Accordingly, the defense's proposal should be rejected.

- **Paragraph 13**: The defense objects to the inclusion of this paragraph in the PSR because the defendant "has not been accused of, nor pleaded guilty to, killing civilians or attacking NGOs/schools."  This paragraph should remain unchanged.  It does not mention the defendant and generally describes the types of attacks against civilians carried out by the Taliban—the militant insurgent group of which the defendant was a member and on whose behalf the defendant carried out acts of terrorism, including the hostage taking of civilians. Just as the Taliban's general background and history is relevant for the Court's consideration, so, too, is Paragraph 13. Notably, this paragraph draws from facts

---

[18] The parties have conferred, and the Government understands that the defense does not believe that a *Fatico* hearing is necessary to resolve any of the defense's objections to the PSR and that the Court can resolve any factual disputes based on the prior record in this case and materials submitted in connection with sentencing.  Indeed, "[b]oth the Supreme Court and [the Second Circuit] have consistently held that the right of confrontation does not apply to the sentencing context and does not prohibit the consideration of hearsay testimony in sentencing proceedings." *United States v. Martinez*, 413 F.3d 239, 242 (2d Cir. 2005) (citing *Williams v. Oklahoma*, 358 U.S. 576, 584 (1959)).  A sentencing court may thus rely upon hearsay evidence, "so long as it permissibly concludes that the evidence is reliable."  *United States v. Kolawole*, 1 F. App'x 93, 94-95 (2d Cir. 2001) (citing *Townsend v. Burke*, 334 U.S. 736, 740-41 (1948)).  This is true even if the defendant can neither confront nor cross-examine the witness whose hearsay statements are being admitted into evidence. *See Unites States v. Bedell*, 590 F. App'x 86, 88 (2d Cir. 2015).

established at the August 2024 combatant immunity evidentiary hearing.  Moreover, the defense's proposal to add in that "both sides bore responsibility for civilian casualties" reflects continued efforts on the part of the defendant to distract from his own conduct and should be rejected.

- **Paragraph 22**: The defense requests that this paragraph be deleted because the defendant argues "it is redundant of the information contained" elsewhere in the PSR or, in the alternative, modified "to exactly track the language set forth in Exhibit A to" the Plea Agreement. This paragraph is accurate and should remain unchanged in the PSR. The paragraph describes what occurred during the June 2008 convoy attack.  As part of his guilty plea, the defendant agreed not to contest that "as a result of the material support provided by the defendant, Taliban fighters under the defendant's command" carried out that attack.  (Plea Agmt. Ex. A).  The paragraph should remain in the PSR, and the defense's proposal to modify the paragraph should be rejected.

- **Paragraph 23**: Like the preceding paragraph, this paragraph is accurate and should remain unchanged in the PSR.  The defendant agreed in connection with this plea not to contest that his material support for acts of terrorism included the June 2008 convoy attack resulting in death as described in this paragraph.  The defendant argues that the paragraph should be deleted because the defendant "did not plead guilty to any personal involvement" in this attack.  However, this paragraph does not state that the defendant personally conducted the attack or personally mutilated the victims, nor has the Government made those allegations, rendering this objection moot.  And as described further below, even if true, the fact that another Taliban fighter may have been among the several individuals who personally participated in or planned the attack does not render this paragraph irrelevant.  To the contrary, the foreseeable results of an attack for which the defendant provided material support are undoubtedly relevant to sentencing and this objection, too, should be overruled.

- **Paragraph 26**: The defense objects to the inclusion of this paragraph, which relates to the Taliban claiming credit for the October 2008 helicopter attack, arguing that "it was not part of the plea allocution or addendum." The defense does not contest the accuracy of the facts in this paragraph (*i.e.*, that the Taliban claimed responsibility for the helicopter attack). The defense's objection to the inclusion of this paragraph is also at odds with the defense's non-objection to Paragraph 25, which describes the helicopter attack. Accordingly, and regardless of whether the defendant specifically allocuted to this attack, the facts in this

42

paragraph constitute relevant conduct that the Court may properly consider at sentencing and which should remain in the PSR. [19]

- **Paragraph 28**: The defense objects to the "paragraph as phrased." This paragraph is accurate and should remain unchanged. ████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

---

[19] To the extent the defendant argues that the October 2008 helicopter attack is not relevant conduct, that argument fails. While the defendant did not specifically allocute to his involvement in that attack, he admitted to being a Taliban commander in Wardak Province, where the helicopter attack occurred. (*See* Plea Agmt., Ex. A). He further admitted that, because of his material support, "Taliban fighters under [his] command were prepared to, and in some cases did, carry out attacks against U.S. servicemembers . . . using, among other things, . . . [RPGs] and other antitank weapons and explosives, **including against U.S. military helicopters**." (*Id.*) (emphasis added). In addition, the predicate offenses to which he pled guilty in Count Two included offenses involving the destruction of aircraft, and the stipulated Guidelines in the Plea Agreement incorporated the applicable Guidelines for those predicate offenses. (*See* Plea Agmt. at 1, 3-4). The Court can properly rely upon the defendant's guilty plea and stipulations in the plea agreement to resolve factual disputes at sentencing. *See United States v. Granik*, 386 F.3d 404, 411-12 (2d Cir. 2004) ("Under our precedents, a stipulation in a plea agreement, although not binding, may be relied upon in finding facts relevant to sentencing."). The defendant's admissions and stipulations establish that this attack—which occurred during the relevant period and in the province where the defendant served as a commander—is thus properly considered as relevant conduct for the offense to which he pled guilty in Count Two. *See* U.S.S.G. § 1B1.3(a)(1)(A) ("relevant conduct" includes "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant . . . that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense."); U.S.S.G. § 1B1.3(a)(1)(B) ("relevant conduct" includes "in the case of a jointly undertaken criminal activity . . . all acts and omissions of others that were[ ] (i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity[ ] that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense."). ████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

43

███████████████████████████████████

- **Paragraph 30**: The defense's proposed additions to this paragraph—that Hostage-2 took Hostage-1's phone from him before they left Kabul, which made it more difficult for U.S. authorities to locate Hostage-1 after the kidnapping, and that Hostage-2 was aware of the plot to kidnap Hostage-1 in advance—should be rejected. The defense has provided no credible evidence that Hostage-2 took steps to prevent U.S. authorities from locating Hostage-1 or that Hostage-2 was complicit in the defendant's plot to kidnap Hostage-1, as evidenced by, among other things, the fact that Hostage-2 was also kidnapped, beaten, and held captive against his will for over seven months. Hostage-2 also categorically denies this baseless allegation. Moreover, even assuming for the sake of argument that Hostage-2 was complicit in a plan to bring Hostage-1 to the defendant to facilitate a kidnapping, which he was not, that does nothing to change the defendant's own culpability, as the defendant pled guilty to the hostage taking of Hostage-1, -2, and -3.

- **Paragraph 32**: The defense's proposed additions to this paragraph—that Hostage-2 did not call the defendant—should be rejected. As described above, the Government is unaware of any credible evidence that Hostage-2 was complicit in the kidnapping. In addition, Hostage-1, -2, and -3 have each reported that Hostage-2 spoke with the defendant over the phone while in the car prior to being taken hostage.

- **Paragraph 34**: The defense objects to the portion of this paragraph that references the defendant's threat to behead Hostage-2 if he told Hostage-1 that Hostage-2 recognized the defendant at the outset of the hostage taking. The defense's objection should be overruled. As reflected in reports produced to the defense in discovery, multiple witnesses have reported this fact. To account for this, and in response to the defense's objection, the Government proposed modified language noting that Hostage-1 and Hostage-2 previously reported this fact, and the Probation Department incorporated that proposal in the PSR.

- **Paragraph 36**: The defendant objects to this paragraph and argues that it refers to phone calls that Badruddin Haqqani arranged and made to the *New York Times* Kabul staff, from Wazirstan via a satellite phone after the kidnapping. This paragraph as drafted in the initial PSR was unclear as to timing. To clarify and address the defense's objection, and consistent with witness accounts (which were previously produced in discovery), the Government proposed a modification that made clear these calls occurred on the afternoon of November 10, 2009, the day the hostages were kidnapped, and that they came from the defendant. The Government also noted that the defendant spoke with a Pashto-speaking staff member at the *New York Times*. The Probation Department largely incorporated the Government's proposal but incorrectly noted that the calls were recorded. They were not.

Accordingly, the only change to this paragraph should be to remove the reference to the calls being recorded.

- **Paragraph 38**: The defendant's commentary on this paragraph was not an objection, and therefore, nothing in this paragraph was changed.  Instead, the defendant was identifying this paragraph as support for its objection to Paragraph 36, discussed above.

- **Paragraph 43**: The defendant requests that this paragraph include that the "Haqqanis remained in control of the situation and over the hostages," regardless of whether "Badruddin's personal interest in the hostages waned."  The Government objects.  While the Haqqani Network was undoubtedly involved in the hostage taking and working with the defendant, the defense's proposal attempts to minimize the defendant's leadership role in the hostage taking charge in Count Eleven.  As noted above, the defendant stipulated in the Plea Agreement to being an organizer or leader of the hostage taking activity.  (*See* Plea Agreement at 6).

- **Paragraph 52**: The defendant requests that Paragraph 52 include that (a) Timor Shah was held by the Haqqani Network for 8 months, as they blamed him for Hostage-1's escape, and (b) that Timor Shah was tortured while detained.  The defense's proposal to include additional information about events surrounding the alleged torture of Timor Shah by the Haqqanis after the period of the charged conduct should be rejected.  The defense has placed this information before the Court by way of the defendant's prior statements, and the Government does not deny that Shah was detained for a period by the Haqqanis.  But the Government is unable to confirm the accuracy of the defendant's statements regarding the months-long torture of his brother.  In any event, even if true, the purported torture of Timor Shah by the Haqqanis after the defendant held the hostages captive for over seven months should not bear on the defendant's sentence in this case.

Accordingly, and for the reasons set forth above, to the extent the defendant stands by his prior objections to the PSR, those objections should be overruled, and the Government's proposed modifications should be granted, consistent with the Probation's Department's determinations. Moreover, consistent with the recommendation of the Probation Department and as described below, regardless of how the PSR objections are resolved, the Government respectfully submits that a Guidelines sentence of life imprisonment is warranted based on the undisputed facts in the PSR and the applicable Section 3553(a) factors.

45

## ARGUMENT

### I.   The Governing Legal Framework

The Guidelines still provide strong guidance to the Court in light of *United States* v. *Booker*, 543 U.S. 220 (2005) and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005).  Although *Booker* held that the Guidelines are no longer mandatory, it held also that the Guidelines remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing.  *Booker*, 543 U.S. at 264.  As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range"—that "should be the starting point and the initial benchmark."  *Gall v. United States*, 552 U.S. 38, 49 (2007).

After that calculation, however, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); the four legitimate purposes of sentencing, *see id*. § 3553(a)(2); "the kinds of sentences available," *id*. § 3553(a)(3); the Guidelines range itself, *see id*. § 3553(a)(4); any relevant policy statement by the Sentencing Commission, *see id*. § 3553(a)(5); "the need to avoid unwarranted sentence disparities among defendants," *id*. § 3553(a)(6); and "the need to provide restitution to any victims," *id*. § 3553(a)(7).  *See Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed

educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2).

Moreover, "the fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall*, 552 U.S. at 50 n.6. Their relevance throughout the sentencing process stems in part from the fact that, while the Guidelines are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," *Rita v. United States*, 551 U.S. 338, 348 (2007), and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall*, 552 U.S. at 46; *see also Rita*, 551 U.S. at 349. To the extent a sentencing court varies from the Guidelines sentence, "[it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Gall*, 552 U.S. at 50.

## II.    The Court Should Impose a Guidelines Sentence of Life Imprisonment

As set forth below, the Government respectfully submits that the Court should sentence the defendant to a term of life imprisonment, which is the sentence called for by the Guidelines and recommended by the Probation Department.

The Government does not make this recommendation lightly. It has carefully considered each of the relevant sentencing factors and arguments made by the defense in support of mitigation. Given the numerous aggravating circumstances present, some of which are unique to this defendant and prosecution, and the lack of any meaningful mitigating factors to balance, let alone outweigh them, the Government respectfully submits that a Guidelines sentence is just and

47

appropriate.  Such a sentence is necessary to reflect the abhorrent nature and extreme seriousness of the defendant's crimes and their devastating effects on victims and their families; to account for the defendant's history of supporting and participating in an insurgent group that carried out acts of violence intended to kill Americans and their allies; to achieve adequate deterrence and promote respect for the law; and to avoid creating unwarranted sentencing disparities with similarly situated defendants who have been sentenced to life imprisonment in analogous cases.

### A.    The Nature and Circumstances of the Offense and the Need for Just Punishment Warrant a Sentence of Life Imprisonment

The defendant was a Taliban commander who led a group of insurgent fighters that took civilians hostage and killed U.S. servicemembers and their allies.  In doing so, the defendant engaged in a years-long course of violent criminal conduct that caused untold harm to the victims of his crimes and their loved ones.  The nature and seriousness of the defendant's conduct, and the need to impose just punishment, thus weigh decidedly in favor of a Guidelines sentence of life imprisonment.  *See* 18 U.S.C §§ 3553(a)(1), (a)(2)(A).

### 1.  The Defendant's Hostage Taking Merits a Life Sentence

To start, the defendant led the brutal hostage taking of three civilians—a heinous crime that, on its own, merits the life sentence called for by the Guidelines.  As described above, the defendant lured his victims to the their capture and kidnapping under the guise of his agreement to sit for a purported interview.  At the defendant's direction, Taliban fighters armed with machineguns then took the victims hostage, blindfolded them, and transported them to an unknown location where the defendant made clear that they were now his prisoners.  For the next approximately seven months, the defendant and his co-conspirators, which included the highest-ranking members of the notorious Haqqani Network, made the hostages' lives—and those of their

48

loved ones back home—a living nightmare. The hostages were under constant guard of armed Taliban fighters and moved from location to location within the tribal areas of Pakistan. Throughout, the defendant and his co-conspirators forced the victims to make ransom calls and film proof of life videos conveying the Taliban's demands for ransom money and the release of Taliban prisoners. Every day, the hostages and their families lived in fear that the defendant and his men could kill the hostages at a moment's notice if their demands were not met. And their fear was well-founded and exactly as the defendant intended: as reflected in the proof of life videos, the hostages were forced to convey to their loved ones and the U.S. Government that, if the Taliban's demands were not met, they would be killed. For example, as described above, the defendant forced Hostage-1, with a machinegun pointed at his head, to pretend to cry and tell viewers, "If you do not meet their demands, you will be responsible for my killing, not the Taliban. Please help me, please have mercy on me. Do not shed my blood. Please, save me. I want to go home." (GX 203 at 1:40-2:40, 203-T at 3). The defendant and his co-conspirators also regularly lied to the hostages about the status of negotiations surrounding their release, a devious and twisted psychological torture that led the hostages, on various occasions, to take desperate measures. As described above, Hostage-1 and Hostage-2 began a hunger strike and, at one point, Hostage-1 also faked an attempted suicide. Nothing worked and, eventually, all three hostages risked their lives escaping from captivity.

It is difficult to imagine conduct more sinister and morally wrong than the hostage taking of civilians. As Judge Forrest recognized when imposing a life sentence on a man convicted at trial of hostage taking resulting in death and various material support charges:

> Hostage taking, I think we all understand, is the ultimate deprivation of liberty of another human being. It is the deprivation of liberty without accommodation in

49

> any way at all, without any kind of accommodation for that person, and it is the use of that person as a bargaining chip and as a dispensable object. It is something which no individual has a right to do to another person[.]

*United States v. Mustafa*, 04 Cr. 356 (AT), Dkt. 474, 74 (Feb. 9, 2015). That is what the defendant did here, knowing and intending the psychological and emotional harm that he and his co-conspirators were inflicting on the hostages. Fortunately, none of the hostages were killed—a fact that may not have been the case had the hostages not eventually managed to escape from captivity. But the fact that they were not murdered does not lessen the gravity of this offense. For example, as described above, both Hostage-2 and Hostage-3 were beaten at times during the hostage taking. The hostages were moved indiscriminately from location to location by armed Taliban fighters, fearing that any day they could be killed by their captors or hit by a drone strike. And they were forced to plead for their lives in proof of life videos filmed by the defendant and his co-conspirators. The seriousness of the offense, and the likelihood that it could have resulted in death or serious bodily injury to any of the hostages, is thus extraordinary.

While this conduct was abhorrent enough in the impact it had on the hostages, they were not the only cognizable victims of the hostage taking. Just as psychologically and emotionally harmed by the defendant's actions were the families, friends, and loved ones of each of the hostages. They were among the intended recipients of the proof of life videos that the defendant and his co-conspirators forced the hostages to make. They were the ones who, every night for over seven months, had to go to sleep worrying about whether their loved ones would be executed, as they were warned would happen if they failed to meet the Taliban's demands. And they were the ones who stood helpless, in some instances thousands of miles away, as they waited for any signs of life, or worse news, to come. The pain and anguish that the defendant put the hostages' families

through is unimaginable, and it further exacerbates the severity of the crime and justifies a Guidelines sentence.

The defendant's motivation for committing this crime, and his deliberate targeting of civilians to achieve that objective, is particularly aggravating.  As the defendant admitted in connection with his guilty plea, the goal of the hostage taking was "to demand ransom money and the release of Taliban prisoners by the United States government."  (Plea Tr. at 41-42).  And while the defendant, through his PSR objections, now attempts to distance himself from harm inflicted on civilians by the Taliban, (*see, e.g.*, PSR at 30 (objecting to Paragraph 13)), that is exactly what he did here.  He devised a plan to kidnap innocent civilians and then was directly involved in holding them against their will for over seven months, using them as pawns to try to coerce the hostages' families and the U.S. government to cave to the Taliban's demands.  The defendant's hostage taking conduct is inexcusable and reprehensible, and it is deserving of a life sentence, standing alone.

### 2. The Defendant's Material Support for Acts of Terrorism Resulting in Death Merits a Life Sentence

The defendant's conviction for providing material support to acts of terrorism, which he admitted was intended to and did result in the deaths of U.S. servicemembers, also independently merits a life sentence.

As described above, and as the defendant admitted in connection with his guilty plea, between 2007 and 2009, he served as a Taliban commander in Wardak Province.  In that capacity, and as he admitted when pleading guilty, the defendant provided material support to acts of terrorism "knowing and intending" that it would be used in furtherance of (i) killing U.S. servicemembers, (ii) the use of explosives against U.S. nationals, (iii) destroying U.S. aircraft, and

(iv) the hostage taking of civilians.  (Plea Agmt. Ex. A).  The defendant further admitted that the Taliban fighters under his command "were prepared to, and in some cases did, carry out attacks against U.S. servicemembers, NATO troops, and/or their Afghan allies," using a variety of means and weapons, including suicide bombers, IEDs, RPGs, and automatic weapons. (*Id.*).  The defendant's jarring admissions are illustrative of his role as a leader of a violent group of insurgents who sought to kill U.S. servicemembers and their allies.  And that is precisely what they did.

As an initial matter, there can be no dispute that the defendant intentionally caused the deaths of U.S. servicemembers.  That is what he admitted in connection with his guilty plea and the Guidelines to which he stipulated, which include first-degree murder cross-references throughout.  (*See* Plea Agmt. at 4-6 & Ex. A ("The defendant further admits that U.S. servicemembers were killed as a result of the material support that he knowingly and intentionally provided.")).  Thus, while the defendant strains to ask the Court not to sentence him like a murderer, that is the conduct to which he pled guilty, and it should serve as the baseline for how the Court evaluates the nature and seriousness of the offense in Count Two.

As described above, between at least approximately 2007 and 2009, the defendant and the men under his command sought to and did kill U.S. servicemembers and their allies through acts of terrorism.  For example, as depicted in the French Interviews, the defendant spoke openly about his role as a Taliban commander and his attacks on Coalition Forces.  He proudly displayed the high-powered weapons that they used for their attacks and how they worked, even firing an RPG and an assault rifle on camera.  But perhaps more revealing than the defendant's access to weapons were his statements in the French Interviews, which offer a window into his mind and his desire to inflict as much carnage as possible.  For example, the defendant spoke candidly about the suicide

52

bombers under his command, stating that "these men, if you ask them, are ready to be suicide bombers. They're ready to die.  They'll put on a belt and blow themselves up if we ask them." (GX 102 at 3:00-3:27; GX 102-T at 5).  He spoke about the ways in which his men used remote control mines to blow up unsuspecting U.S. military vehicles, (see GX 101 at 4:40-5:08; GX 101-T at 6-7), and how they ambushed Coalition Forces, (see GX 102 at 25:00-25:25; GX 102-T at 25).   And the defendant's comments were not mere bluster—he carried out his deadly rhetoric. For example, in or around September 2008, the defendant was recorded as he led an attack on an ANP outpost in Wardak Province, which reportedly resulted in the killing of three Afghan police officers.

To compound matters, just a few months prior to the ANP outpost attack, Taliban fighters under the defendant's command carried out an attack on a U.S. military convoy in Wardak Province, using the exact same tactics that the defendant spoke about in the French Interviews. That attack, which occurred on June 26, 2008, resulted in the murder of three U.S. servicemembers and their Afghan interpreter, as well as the destruction of two U.S. military vehicles.  As described above, as a result of that horrific attack, at least one of the victims' bodies was mutilated and others were burned. While the defendant argues that he was not personally involved in planning or carrying out that attack, that is of no moment even if it is true:  there is no dispute that, because of the defendant's material support, Taliban fighters under the defendant's command carried out the attack.  (See Plea Agmt., Ex. A).  The blood of the victims of that attack is on the defendant's hands, just as much as it is on the hands of all the Taliban fighters who played a role in that attack and its gruesome aftermath, which was clearly foreseeable to the defendant.  Indeed, after the attack, the defendant told multiple witnesses that his men had carried out the ambush—evincing a

53

satisfaction with the murder of the victims that is deeply troubling yet consistent with the defendant's admitted intent and insatiable desire to kill U.S. servicemembers. And as described above, Taliban fighters under the defendant's command carried out even more attacks during the relevant period because of the material support he provided, including the shootdown of a U.S. military helicopter in October 2008, which fortunately did not result in any casualties.

Put simply, the defendant was not a passive participant in the Taliban whose support for acts of terrorism simply allowed others to carry out attacks—which, to be clear, would be a serious course of criminal conduct meriting a significant punishment. But the defendant was far more: a hands-on Taliban commander who trained his men, gave them access to weapons, and encouraged them to commit unspeakable acts of violence, which resulted in the murder of U.S. servicemembers and their allies, just as the defendant intended. As if that was not enough, and as further described above, the defendant's acts of terrorism were not limited to military and law enforcement personnel; they also included the hostage taking of civilians. The seriousness of that conduct cannot be overstated.

The defendant's conduct is further aggravated by the harm that he caused to the families and friends of the U.S. servicemembers that were killed because of his conduct. The families of the victims who were killed in the June 2008 convoy attack—their spouses, children, siblings, and parents—will forever live with the pain and loneliness caused by the defendant and the fighters under his command. And, as reflected in the victim impact letters provided to the Court and counsel, the U.S. servicemembers who survived the attack must now live with the memory of having seen their friends and fellow soldiers fall in an ambush that haunts them to this day. Accordingly, the seriousness of the defendant's conduct as it pertains to Count Two also

independently justifies the imposition of a life sentence.

      **B.**        **The History and Characteristics of the Defendant**

A Guidelines sentence of life imprisonment is also appropriate considering the defendant's history and characteristics, which reflect a troubling pattern of supporting and participating in attacks against U.S. servicemembers in Afghanistan and his admitted efforts to obstruct justice in the instant case.

To start, while the defendant attempts to minimize the import of having joined the Taliban in approximately 1996, the Court has found that, by the end of 2001, the Taliban was "nothing more than an insurgent group engaged in an effort to overthrow the lawful government of Afghanistan" and that the killing of U.S. servicemembers was "an act condemned by the international community and indeed criminal." (Nov. 1, 2024 Hr'g Tr. at 26-27). As set forth in the defendant's submission, since at least 2004, the defendant admits that he had taken up arms with the Taliban and was carrying out operations on its behalf. (*See* Def. Mem. at 18-19). In approximately 2007, after spending time in prison in Afghanistan, the defendant began operating in Wardak Province as a commander. (*Id*. at 20-21). And there is no dispute that, by then, the defendant was in charge of Taliban fighters who intended to and did kill U.S. servicemembers. (*See* Plea Agmt. Ex. A). Indeed, as described above, by at least approximately November 2007, the defendant was an avowed jihadist set on carrying out attacks aimed at killing U.S. servicemembers and their allies. As he indicated in the November 2007 interview with France24, the defendant and his men considered themselves "Taliban fedayeen," ready to "carry out suicide bombings" or to use "any technique" in pursuit of jihad. (GX 101 at 6:00-6:20; GX 101-T at 8). The defendant's violent rhetoric, and the actions he took to back that up, continued through 2008

and into 2009, and are unquestionably aggravating facts that further support the imposition of a Guidelines sentence.

But the defendant's troubling ideology and desire to kill Americans does not appear to have stopped there. As the defendant admitted in his post-arrest statement, in or around 2013, he was interviewed by a writer for *Newsweek*. The article that was published, titled "Mullah Najibullah: Too Radical for the Taliban," discusses the defendant's rise within the Taliban and his view that the Taliban should not engage in peace talks with the United States.[20] The article also discusses how the defendant created a new rival faction within the Taliban to fight the "puppet" government in Kabul and the American "infidel invaders," further quoting the defendant as saying that "[t]here is much criticism among our ground fighters of these peace moves . . . so we decided to establish the movement to stop it."[21] The article also notes that the defendant "says he organized a failed suicide attack in 2006" against the former Afghan president and kidnapped one of his deputies for ransom; that he and his men "were behind some of the biggest attacks against American convoys in Kabul and on U.S. outposts" in Wardak Province; and that he claimed responsibility for the kidnapping of Hostage-1. It thus appears that the defendant's violent ideology—and his

---

[20] *See* "Mullah Najibullah: Too Radical for the Taliban," *Newsweek*, (Aug. 30, 2013), *available at* https://www.newsweek.com/2013/08/30/mullah-najibullah-too-radical-taliban-237894.html; *see also* "Haji Najibullah: A Brief Glimpse of the Leader of Afghan Taliban Splinter Group Feda'I Mahaz," *Jamestown*, (May 31, 2014), *available at* https://jamestown.org/haji-najibullah-a-brief-glimpse-of-the-leader-of-afghan-taliban-splinter-group-fedai-mahaz/. In his post-arrest statement, the defendant noted that the *Newsweek* article (which he apparently had seen) misattributed his *kunya* as "Umar Khattab."

[21] In the report prepared by Michael Semple, attached to the defendant's submission, there appears to be a reference to this subsequent Taliban faction that the defendant started. *See* Def. Mem. Ex. A at 19 (referencing the defendant's "later decision to launch a rival group," which Semple concluded "demonstrated that he had no institutional loyalty to the Taliban Movement.").

willingness to speak openly about it—did not dissipate after the hostages escaped.

In addition to the defendant's violent history as a Taliban commander, after the defendant arrived in the United States to face prosecution for his crimes, he attempted to obstruct justice by making false statements in connection with his motion to suppress his post-arrest statements, including to suppress admissions that he committed the hostage taking. (*See* Plea Agmt. at 6) (stipulating that a two-level enhancement for attempting to obstruct justice for "making false statements in his affidavit and providing false testimony"). The defendant's admitted perjury speaks to the defendant's character and serves as another aggravating fact that, in combination with the other Section 3553(a) factors described herein, further supports the imposition of a Guidelines sentence.

Accordingly, while the Government recognizes that the defendant endured difficult circumstances throughout his childhood, as further discussed below, those circumstances are no excuse for the decisions he made time and again as an adult to support and carry out acts of terrorism, including against civilians. The defendant's history and characteristics thus provide no justification for leniency in this case and instead serve as aggravating factors justifying the imposition of a life sentence.

C.     **The Need to Afford Adequate Deterrence and Promote Respect for the Law**

A Guidelines sentence of life imprisonment also is necessary to serve the sentencing goals of adequately deterring criminal conduct—in this case, acts of terrorism aimed at murdering U.S. servicemembers and the hostage taking of civilians—and to promote respect for the law prohibiting such horrific conduct. *See* 18 U.S.C. §§ 3553(a)(2)(A), 3553(a)(2)(B).

The need for deterrence is especially important in the context of terrorism offenses. Terrorism is a crime with high recidivism rates and rehabilitation is notoriously difficult for those convicted of it. *See United States v. Meskini*, 319 F.3d 88, 91-92 (2d Cir. 2003) (noting the link between "the difficulty of deterring and rehabilitating" terrorists and the conclusion that "terrorists and their supporters should be incapacitated for a longer period of time"); *United States v. Stewart*, 590 F.3d (2d Cir. 2009) 181 ("In no area can the need for adequate deterrence be greater than in terrorism cases, with their potential for devastating loss of innocent life.") (Walker, J., concurring); *United States v. Abdullah*, 20 Cr. 677 (AT) (S.D.N.Y. Dec. 22, 2025) (noting that the "Second Circuit has repeatedly noted the importance [of deterrence] with regard to terrorism crimes").

Here, the Guidelines sentence sought by the Government would incapacitate the defendant for the remainder of his life; however, should the Court instead sentence the defendant to a term of years, it is critically important that the sentence imposed deter the defendant from future criminal conduct. As described above, the defendant has demonstrated a willingness to commit acts of terrorism against U.S. military personnel and civilians alike. And while recidivism often decreases with age, courts "have rejected this reasoning" in terrorism cases because "terrorists[], [even those] with no prior criminal behavior[,] are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation." *United States v. Jayyousi*, 657 F.3d 1085, 1117 (11th Cir. 2011) (citations omitted). This is particularly true where, as here, the defendant is not convicted of a single act which may be an aberration or momentary lapse; the defendant engaged in a years-long campaign of terror, resulting in violence and kidnapping. He was unrepentant throughout, and brazen enough to boast in the media about his heinous conduct. And then, more recently, he lied in an effort to suppress evidence of his crimes,

58

and perjured himself before this Court.  There is every reason to believe that the defendant poses a future risk if not adequately deterred from criminal conduct if he is released from prison, and the need to deter such conduct further supports the imposition of a Guidelines sentence.

Moreover, "[g]eneral deterrence is essential [in terrorism cases] so that the severe consequences of choosing terrorism are apparent to all who might consider it." *United States v. Babafemi*, No. 13 Cr. 109, 2021 WL 1210313, at *6 (E.D.N.Y. Mar. 31, 2021).  That is particularly true where, as here, the crimes the defendant committed continue to occur around the world at present.  For example, journalists, NGO workers, missionaries, and others continue to be taken hostage and/or are wrongfully detained by terrorist organizations and malign foreign governments.[22]  It is critically important—for both general deterrence and to promote respect for the law—that those who may consider carrying out such vile acts against innocent civilians know that, when they are caught and prosecuted for those crimes, they will spend the rest of their lives in prison.  The same is true of those who choose to provide material support to acts of terrorism, particularly where, as here, such support results in the death of U.S. servicemembers who risk their lives to protect the United States and its citizens.  A life sentence would thus send a resounding and critically important message of deterrence: that no matter how much time passes or where a defendant commits these crimes of terrorism, they will be punished to the full extent of the law.

Accordingly, the need to afford adequate deterrence and to promote respect for the law also support the imposition of a Guidelines sentence.

---

[22] *See, e.g.*, https://www.pbs.org/newshour/world/kidnapped-american-journalist-shelly-kittleson-has-been-released-iraqi-official-says.

59

**D.      A Life Sentence Would Not Result in Unwarranted Sentencing Disparities**

The need to "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" also strongly supports the imposition of a Guidelines sentence of life imprisonment in this case.  *See* 18 U.S.C. §§ 3553(a)(6).

As an initial matter, the undisputed Guidelines sentence is life imprisonment.  As the Second Circuit has explained, "the guidelines cannot be called just another factor in the statutory list, 18 U.S.C. § 3553(a), because they are the only integration of the multiple factors." *United States* v. *Rattoballi*, 452 F.3d 127, 131 (2d Cir. 2006) (internal quotation marks and citations omitted); *cf. United States v. Fernandez*, 443 F.3d 19, 28 (2d Cir. 2006) (stating that "the Guidelines range should serve as 'a benchmark or a point of reference or departure' for the review of sentences" (quoting *United States* v. *Rubenstein*, 403 F.3d 93, 98-99 (2d Cir. 2005))).  "[T]o secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall*, 552 U.S. at 50.  It is precisely because the Guidelines function as a national "benchmark" that a Guidelines sentence here will advance "the need to avoid unwarranted sentence disparities." 18 U.S.C. § 3553(a)(6). As discussed above, a life sentence is commensurate with the gravity of the defendant's federal crimes of terrorism.  Indeed, the Guidelines offense level applicable to the defendant's conduct is 67, which is shockingly higher than the offense level of 43 that triggers a Guidelines range of life imprisonment irrespective of a defendant's criminal history.

While a sentence of life imprisonment is not routine as a general matter, life sentences are regularly imposed in cases where, as here, a defendant knowingly and intentionally supports and carries out acts of terrorism aimed at taking civilians hostage and/or murdering U.S. nationals.  For

example, in *United States v. Hamidullin*, the defendant was a former Taliban fighter who—like the defendant—participated in an attack on an Afghan Border Police outpost and claimed to be a lawful enemy combatant. *See* 114 F. Supp. 3d 365 (E.D.V.A. July 13, 2015). Notably, and in contrast to the facts here, there were no Afghan or American casualties resulting from the attack, nor were there any allegations about Hamidullin brutally kidnapping civilians. Nevertheless, the Court sentenced Hamidullin to life imprisonment plus thirty years. *See* 14 Cr. 140 (HEH), Dkt. 238 at 1, 249 at 33 (E.D.V.A. Nov. 25, 2015). Similarly, in *United States v. Hausa*, the defendant was an al Qaeda operative who trained at al Qaeda camps and carried out attacks on U.S. and Coalition troops in Afghanistan, one of which left two U.S. servicemembers dead and others injured, and conspired to attack U.S. facilities in Africa. *See United States v. Hausa*, 258 F. Supp. 3d 265, 267 (E.D.N.Y. June 27, 2017). The Court sentenced Hausa to life imprisonment plus ten years. *See United States v. Hausa*, Cr. 134 (BMC), Dkt. 306 (E.D.N.Y. Feb. 26, 2018). And in *United States v. Mustafa*, discussed above, the Court sentenced the defendant to life imprisonment for his participation in a hostage-taking that resulted in death and various material support offenses, including offenses involving support for the Taliban. *See United States v. Mustafa*, 04 Cr. 356 (AT), Dkt. 474, 74 (S.D.N.Y. Feb. 9, 2015); *see also United States v. Elsheikh*, 20 Cr. 239 (TSE), Dkt. 356 (E.D.V.A. Aug. 19, 2022) (imposing life sentences for conspiring to murder U.S. nationals and providing material support to terrorists, to be served concurrently with mandatory life sentences, in a case involving the death of eight hostage taking victims). While those cases involved defendants convicted at trial, they nonetheless demonstrate that conduct comparable to the defendant's merits a life sentence.

61

Importantly, courts have also imposed significant sentences, including life imprisonment, in terrorism cases where a defendant is convicted of conspiring or attempting to carry out an attack targeting Americans, but the plot ultimately was thwarted or unsuccessful such that no victim was killed. *See, e.g.*, *United States v. Mohammed Mansour Jabarah*, No. 02 Cr. 1560 (BSJ) (S.D.N.Y. Jan. 18, 2008) (life sentence for al Qaeda operative who conspired to bomb U.S. embassies in Singapore and the Philippines); *United States v. Richard Reid*, No. 02 Cr. 10013 (WGY) (D. Mass. Jan. 30, 2003) (life sentence for al Qaeda supporter who attempted to detonate shoe bomb during international flight); *United States v. Abdul Hakim Murad*, No. 93 Cr. 180 (LAK) (S.D.N.Y. May 15, 1998) (life sentence for al Qaeda operative who participated in plot to place bombs on airliners bound for United States from Asia); *United States v. Oussama Kassir*, No. 04 Cr. 356 (JFK) (S.D.N.Y. Sept. 15, 2009) (life sentence for al Qaeda supporter who attempted to establish a jihad training camp in the United States and disseminated bomb-making manuals); *United States v. Melzer*, 20 Cr. 314 (GHW) (S.D.N.Y. Mar. 3, 2023) (sentenced to 540 months' imprisonment for attempting to murder U.S. servicemembers, providing and attempting to provide material support to terrorists, and illegally transmitting national defense information); *United States v. Pham*, No. 12 Cr. 423 (RMB) (S.D.N.Y. Feb. 5, 2025) (al Qaeda member sentenced to 44 years in prison for attempted suicide bombing).  Here, of course, the defendant did not just conspire or attempt to commit the crimes: his material support to acts of terrorism resulted in the killing of U.S. servicemembers, and he took hostage three civilians for over seven months.  A Guidelines sentence of life imprisonment would thus also be in line with those attempt and conspiracy cases as well.

Tellingly, the defendant has not cited a single comparator case in support of his request for an 18-year sentence.  And for good reason: defendants convicted of committing acts of terrorism

that result in the hostage taking of civilians and the murder of U.S. nationals often spend decades or life in prison, as called for by the Guidelines.  Each of these offenses on its own is worthy of a sentence far beyond the sentence called for by the defense.  In fact, were the Court to grant the defendant's request for an 18-year sentence—or a sentence remotely close to that—such a sentence would result in unwarranted sentencing disparities.  *See, e.g.*, *United States v. Mumuni Saleh*, 946 F.3d 97, 113 (2d Cir. 2019) (finding that "Mumuni's sentence of 17 years' imprisonment—which constitutes an 80% reduction from his recommended Guidelines range of 85 years—is substantively unreasonable in light of his exceptionally serious conduct involving a domestic terrorist attack against law enforcement in the name of ISIS."); *see also Stewart*, 590 F.3d at 182 (finding that, in a terrorism case with recommended Guidelines range 360 months' imprisonment, "[t]he imposition of a 28–month prison sentence slighted the extreme criminality of Stewart's offense and disregarded the manifest purpose of the Guidelines regime: to avoid 'unwarranted sentencing disparities'") (Walker, J., concurring) (cleaned up).  Indeed, as reflected in the PSR, over the last five years, defendants with an offense level of 43 and a Criminal History Category of VI, like the defendant, received an average sentence of 405 months' imprisonment—almost double the length of the 18-year sentence the defendant seeks.  (PSR at 26).  And as described above, where, as here, defendants have been convicted of providing material support to acts of terrorism resulting in death and hostage taking, courts regularly and appropriately impose life sentences.

Accordingly, a life sentence would be comparable to the sentences imposed on similarly situated defendants around the country and would avoid unwarranted sentencing disparities.

63

### III.    The Defendant's Sentencing Arguments Are Meritless

In support for his request that the Court impose an 18-year sentence on his convictions for providing material support to acts of terrorism resulting in death and hostage taking, the defendant makes several arguments that he claims are sufficiently mitigating to merit an extreme downward variance from the Guidelines sentence of life imprisonment.  The defendant is wrong.  As set forth below, none of the arguments the defendant raises counsels in favor of the significant downward variance he seeks, which, as described above, would be completely out of step with sentences imposed on similarly situated defendants.[23]

#### A.  The Defendant's Guilty Plea

The defendant argues that "[p]erhaps the chief mitigating factor" is his purported acceptance of responsibility for having pleaded guilty prior to trial.  (Def. Mem. at 2).  The defendant contends that it is "axiomatic that [he] should not get the same sentence after pleading guilty" that he would have received if he had "gone to trial and lost on all counts," which would have carried a mandatory life sentence.  (*Id*.).  The defendant's request for leniency fails to appreciate several factors.

To start, the defendant ignores that he is not entitled to the standard three-level reduction under the Guidelines for acceptance of responsibility because he stipulated that he attempted to obstruct justice, (*see* Plea Agreement at 6), which "ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct." U.S.S.G. § 3E1.1 n.4; *see also*

---

[23] The Government's response to the defendant's request to be present for the classified portions of his sentencing proceeding, (*see* Def. Mem. at 37-40), is set forth in the Government's June 3, 2026 classified submission.

*United States v. Praddy*, 602 Fed. App'x 38, 40 (2d Cir. 2015) (no abuse of discretion in refusal to apply the acceptance of responsibility adjustment based on prior perjured testimony). In this case, the defendant's obstruction of justice involved his effort to mislead the Court into suppressing his post-arrest statements, by claiming falsely, for example, that he was not given *Miranda* warnings for over two hours after his questioning began. (*See* May 6, 2024 Tr. at 14 ("There were other topics on which Mr. Najibullah testified that are undercut or refuted by the testimony of Mr. Wyka, and among these are the assertion that Mr. Najibullah was not advised of his *Miranda* rights until two hours into the flight.")). Moreover, despite claiming to have accepted responsibility for his crimes, the defendant continues to try to cast blame on others, minimize his role, and stretch the bounds of the reality of this case to distance himself from some of the most troubling facts underlying his conviction. As evidenced by certain of his PSR objections, the defendant attempts to walk a tightrope between accepting responsibility for the bare minimum to which he allocuted, while disclaiming responsibility for certain conduct that resulted from his crimes and was clearly foreseeable to him. [24] *See* U.S.S.G. § 3E1.1 n.1(A) ("A defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility[.]"); *United States v. Kumar*, 617 F.3d 612, 635-36 (2d Cir. 2010) (affirming district court's decision to deny acceptance points because the defendant's "carefully worded plea allocution . . . muted the gravity of his complicity" and because the defendant objected to the PSR on meritless and later withdrawn grounds). Accordingly, this

---

[24] *See, e.g.*, PSR at 31 (arguing that Paragraph 22 of the PSR describing the June 2008 convoy attack "should be amended to exactly track the language set forth in Exhibit A" to the Plea Agreement).

is not a case in which the defendant's guilty plea and claimed acceptance of responsibility weigh in favor of leniency, much less the drastic downward variance that the defendant requests.

In addition, as a general matter, there is nothing inequitable or unfair about the Government seeking a Guidelines sentence following a guilty plea, even when that Guidelines sentence is comparable or greater to any mandatory sentence the defendant would have faced post-trial. Indeed, the Government regularly does so where, as here, the Section 3553(a) factors weigh in favor of advocating for such a sentence. For example, in *United States v. Santana*, the parties entered into a plea agreement that stipulated to a Guidelines range of life imprisonment and included a detailed factual stipulation appended to the plea agreement regarding murders and other acts of violence ordered by Santana. *See* 20 Cr. 22 (JMF), Dkt. 161 at 24-25 (S.D.N.Y. March 28, 2023). The Government then sought, and Judge Furman imposed, a sentence of life imprisonment. *Id*. at 27.[25]

Accordingly, the fact that the defendant pled guilty does not counsel in favor of the significant downward variance that he seeks.

## B. The Defendant's Personal Background

The defendant next argues that his "difficult personal circumstances and mitigating path to the Taliban" support the significant downward variance that he seeks. (Def. Mem. at 4).

---

[25] *See also, e.g.*, *United States v. Cabrera*, 22 Cr. 10 (NRB), Dkt. 243, (S.D.N.Y. Jan. 14, 2025) (sentencing the leader of a Bronx-based drug crew, who pled guilty and agreed not to contest at sentencing certain fentanyl-related poisonings caused by the drug sales of others, and who would have faced a 25-year mandatory minimum if convicted at trial, to a Guidelines sentence of 30 years' imprisonment).

As an initial matter, the Government recognizes that the defendant undoubtedly faced difficult circumstances as a child and teenager. But the defendant's decisions as an adult to join the Taliban—a militant group that provided safe harbor and a training ground for the most notorious terrorists in the world—and to later take up arms to carry out attacks against U.S. and Coalition Forces were his own. And even after returning to Afghanistan after allegedly being imprisoned in Saudi Arabia for his association with the Taliban, the defendant once again made the choice to re-join the Taliban with his brother, Timor Shah. (*See* Def. Mem. at 17). The defendant then began his years-long campaign with the Taliban, in charge of fighters who carried out horrific acts of violence. The defendant did not need to pursue that path, but he chose to do so. Indeed, many Afghans faced dire economic circumstances and significant safety concerns during the same period and did not elect to partake in the Taliban's murderous agenda. And to the extent the defendant's personal background includes any positive characteristics, those characteristics pale in comparison to the severity of the conduct to which he pled guilty.

Accordingly, the defendant's personal circumstances do not counsel in favor of the significant downward variance he seeks.

## C.    The Defendant's Role as a Taliban Commander and the June 2008 Attack

The defendant also argues that he was a "low-level Taliban commander" who "did not personally participate" in the June 2008 convoy attack, and that it would be "unfair and a miscarriage of justice to sentence him as if he specifically intended, planned, and conducted the operation." (Def. Mem. at 18-24). The Court should reject the defendant's continued attempts to distance himself from the brutal aftermath of this attack in the hope of obtaining leniency.

67

To start, the defendant pled guilty to providing material support to acts of terrorism that he knew were intended to, and which did, result in the killing of U.S. servicemembers. (*See* Plea Agmt. at 1, Ex. A). The defendant further agreed "not to contest . . . at sentencing" that, "[o]n or about June 26, 2008, **as a result of the material support provided by the defendant, Taliban fighters under the defendant's command attacked a U.S. military convoy** . . . killing three U.S. servicemembers . . . and their Afghan interpreter." (Plea Agmt., Ex. A) (emphasis added). And as described above, the defendant told multiple witnesses that his men had carried out the attack.[26] (*See supra* at 16). To the extent the defendant now claims that the subsequent mutilation of one of the victims was not reasonably foreseeable to him, (*see* Def. Mem. at 23), that argument also fails—the defendant was a Taliban commander who was well-aware of the brutal tactics used by the Taliban when attacking U.S. and Coalition Forces. Put simply, the defendant should be held accountable for the results of an attack that he supported, whether or not he personally participated in it or even explicitly directed it.

In support of his argument, the defendant relies on a report prepared by Michael Semple, which concludes that another Taliban commander was the one responsible for planning and carrying out the attack. (*See* Def. Mem. Ex. A). Semple's report is based entirely on hearsay evidence that Semple obtained from various sources, including from the defendant's brothers. (*See*

---

[26] Indeed, even the defendant's brother, Timor Shah, told Hostage-3 that the defendant's men had carried out the attack while showing Hostage-3 a video of the attack itself. (PSR ¶ 24). And as depicted in the French Interviews, the defendant spoke openly about how his men ambushed U.S. and Coalition Forces. (GX 102 at 25:00-25:25; GX 102-T at 25).

*id.* at 1).[27]  Semple concludes that, in his view, it is unlikely that defendant would have personally carried out attacks in the area where the June 2008 convoy attack occurred.  (*Id.*).  Instead, Semple asserts that the defendant provided material support for that attack by "free[ing] up Taliban resources for deployment elsewhere in [Wardak Province]," which "enabled insurgents' violence in the north of the province" where the June 2008 convoy attack occurred.  (*Id.*).  The defendant's argument—designed to avoid being held accountable for the results of that attack—is too clever by half.  As described above, the defendant admitted that U.S. servicemembers were killed because of the material support that he knowingly and intentionally provided, and he agreed not to contest that Taliban fighters "under [his] command" carried out the attack.  (Plea Agreement, Ex. A).  In addition, Semple fails to take into account that (i) the defendant made statements to multiple witnesses about his men having carried out the attack, (ii) the defendant's men, including his own brother, made statements about having carried out the attack, and (iii) the defendant and his men drove "about two hours" to carry out an attack on an ANP outpost in Sayed Abad, where the June 2008 convoy attack occurred, just a few months later, (GX 102 at 17:25- 17:40; GX 102-T at 18).  It thus strains credulity to suggest that his association with the attack was so far removed that he should not be held accountable for its outcomes.

Semple's conclusion that another Taliban commander was likely the one responsible for the planning and execution of the attack, and the subsequent mutilation, even if true, is not

---

[27] Semple also concedes that a "reliable official record of roles and events [regarding the Taliban's activities in Afghanistan during the relevant period] rarely exists," and that the report is thus based on his "triangulat[ion] of different sources" from Afghanistan, which he describes as a "tricky information environment" with "much misinformation."  (*Id.*).

mitigating for the defendant.  As described above, the Government does not allege that the defendant was personally present at the attack.  The fact that another Taliban commander may have been among those involved in planning and carrying out the attack has no bearing on whether the defendant—who agreed not to contest that men under his command carried out the attack—should be held accountable for the conduct of those who carried out the attack with his support.

Accordingly, the defendant's self-serving arguments that he was a low-level Taliban commander, and that another Taliban commander was more culpable than him for the June 2008 attack, ring hollow.

### D.    The Defendant's Prosecution as a Member of the Taliban

Next, the defendant argues that he is "the only native Afghan to face prosecution in the United States federal court" for carrying out acts of terrorism in Afghanistan during the relevant period, and that other "more culpable Taliban leaders" have not faced similar prosecutions.  (Def. Mem. at 24-25).  The defendant's arguments are misplaced for multiple reasons.

First, the defendant is not the only person who has been prosecuted in the United States for conduct like that present here.  There are multiple cases where defendants have claimed that they were lawful enemy combatants fighting for the Taliban in Afghanistan and thus immune from prosecution.  For example, as described above, in *Hamidullin*, the defendant was a Russian national associated with the Haqqani Network who participated in an attack on an Afghan Border Police outpost.  *See United States v. Hamidullin*, 888 F.3d 62, 65 (4th Cir. 2018).  And in *United States v. Lindh*, a U.S. national was prosecuted for crimes relating to his "taking up arms with the Taliban" in Afghanistan.  215 F. Supp. 2d 541, 545 (E.D.V.A. 2002); *see also Hausa*, 258 F. Supp. 3d at 267 (prosecution of a defendant who traveled to Afghanistan, joined al Qaeda, and carried

70

out attacks against American soldiers).    And as cited in the Government's supplemental memorandum of law in opposition to the defendant's enemy combatant motion, there are numerous cases in which defendants have been prosecuted for supporting terrorist organizations in conflict zones despite similar claims of combatant immunity.  (*See* Dkt. 117 at 8-9) (collecting cases).  The fact that the defendant may be the first Afghan-born Taliban member prosecuted for acts of terrorism resulting from conduct that took place in Afghanistan is of no moment; indeed, nothing about that lessens the severity of the defendant's crimes and the harm they caused.

Second, that other Taliban members also committed despicable acts of terrorism and have not been prosecuted in a United States court does not mitigate the defendant's conduct or render his prosecution unfair.  For example, the defendant devotes twelve pages of his 46-page sentencing submission to argue that Sirajuddin Haqqani carried out numerous acts of terrorism resulting in death and had more authority than the defendant with regards to the hostage taking.  (*See* Def. Mem. at 25-37).  Setting aside that this argument only underscores that the defendant chose to commit the hostage taking with one of the world's most notorious terrorists (an aggravating factor in its own right), the fact that Sirajuddin Haqqani has not been prosecuted does nothing to support the defendant's request for an 18-year sentence.[28]  Indeed, law enforcement decisions of whom to pursue and when are irrelevant to the Court's evaluation of the relevant Section 3553(a) factors.

---

[28] Ironically, the defendant's admissions that he committed the hostage taking alongside the leaders of the Haqqani Network, and worked hand-in-hand with Badruddin for months, undermine his argument that he was an irrelevant, low-level Taliban commander with few connections and little influence during the relevant period.  (*See* Def. Mem. at 18-24).

The Court should thus reject the defendant's efforts to point to other individuals whom he believes are more culpable and have not been prosecuted in the United States as a basis for leniency.

### E.    The Defendant's Conditions of Confinement

Finally, the defendant argues that the conditions of confinement he has endured during the pendency of this case counsel in favor of a significant downward variance. They do not. While the Court, of course, may consider the conditions of incarceration in determining the defendant's sentence, the dramatic variance the defendant seeks on that basis is wholly inappropriate when measured against the severity of his conduct, as well as the other 3553(a) factors. *See United States v. Woodberry*, No. 22-433, 2023 WL 3573759, at *2 (2d Cir. May 22, 2023) (sentence within District Court's discretion when it "declined to vary further" than "a modest downward variance" in light of custodial conditions during pandemic "because it determined that the mitigating factors in [defendant's] favor were offset by several aggravating factors").

Moreover, while a number of courts in this District have previously found that the conditions at MDC were in need of significant improvement, the MDC has taken serious steps to address those issues over the years and has steadily improved conditions, increasing staffing levels and addressing medical issues.[29] As Judge Caproni noted in 2024, "MDC is improving every day." 24 MJ 4261 (UA) (VEC), Dec. 10, 2024 Tr. 15). And even when defendants were incarcerated at the height of the pandemic, courts found that the conditions at the MDC did not warrant "significant Guidelines departure[s]" requested by defendants. *See United States v. Stewart*, No. 21 Cr. 42 (WFK), 2023 WL 2599668, at *7 (E.D.N.Y. Mar. 22, 2023); *see also, e.g.,*

---

[29] *See, e,g.*, https://www.bop.gov/resources/pdfs/mdc_brooklyn_fact_sheet_may_2026.pdf.

*United States v. Sanchez*, No. 01 Cr. 74-2 (PAC), 2022 WL 4298694, at *2 (S.D.N.Y. Sept. 19, 2022) (finding, in context of compassionate release motion, that "the difficult—but generalized— prison conditions during the COVID-19 pandemic" do not constitute extraordinary and compelling circumstances for a defendant's release); *United States v. Boynton*, No. 20 Cr. 43 (RPK), 2022 WL 7131927, at *1 (E.D.N.Y. Oct. 12, 2022) (collecting cases to same effect). Accordingly, the defendant's conditions of confinement do not counsel in favor of a downward variance.

## **CONCLUSION**

From the outset of this case, the defendant has argued that his case is unique. And it is, but not for the reasons he has ever articulated. It is unique not because the defendant claimed to be a lawful enemy combatant being prosecuted in a federal courtroom—he is not. Or because he has offered what he asserts is compelling mitigation that suffices to offset the conduct underlying his conviction—he has not. It is unique because the defendant's conviction is, in many respects, uniquely grave in a federal courtroom in this country. The defendant led a violent insurgent group hellbent on killing Americans and their allies. And he succeeded. His actions resulted in the brutal murder of U.S. servicemembers; the kidnapping and hostage taking of three innocent civilians, forced to plead for their lives at gunpoint in callous videos intended to extort their grieving families; and months and years of unimaginable pain and sorrow for the families of every single victim he harmed. While the defendant's conduct is, fortunately, unique in many respects, at bottom he is, like so many others prosecuted in this courthouse and throughout this country, a convicted terrorist who must held accountable for the atrocities he supported and committed.

A life sentence is warranted.

* * *

73

Dated: New York, New York
        June 3, 2026

Respectfully Submitted,

JAY CLAYTON
United States Attorney for the
Southern District of New York

By: _____
    Sam Adelsberg
    Jacob H. Gutwillig
    David J. Robles
    Assistant United States Attorneys
    (212) 637-2494/-2215 / -2550

cc:    Defense Counsel
       By ECF and email

74